UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

GOLDY STERN,

                        Plaintiff,

       -against-

STATE UNIVERSITY OF NEW YORK, PITTS
MANAGEMENT ASSOCIATES, INC., JOHN
DOOLEY, DILIP NATH, ROY SOOKHOO, and
STUART CLENMAN,

                      Defendants.

------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-5588 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Goldy Stern brings this discrimination action against the State University of New York ("SUNY" or "SUNY-DMC"), Dilip Nath, Roy Sookhoo, and Stuart Clenman (collectively, the "State Defendants"); Pitts Management Associates, Inc. ("PMA"); and John Dooley (collectively, "Defendants"). (2d Am. Compl. ("SAC") (Dkt. 81).) Plaintiff asserts claims arising out of her employment at SUNY Downstate Medical Center ("SUNY-DMC")[1] under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; Section 504 of the Rehabilitation Act of 1984 (the "Rehabilitation Act"), 29 U.S.C. § 794; 42 U.S.C. § 1981; and various provisions of state, municipal, and common law. (See SAC.)

      Before the court are separate motions to dismiss Plaintiff's second amended complaint (the "SAC") by the State Defendants, PMA, and Dooley. (See Dooley Mot. to Dismiss ("Dooley Mot.") (Dkt. 59); PMA Am. Notice of Mot. to Dismiss ("PMA Mot.") (Dkt. 63); State Defs. Notice of Mot. to Dismiss ("State Mot.") (Dkt. 65).) For the following reasons, the State

---

[1] While SUNY and SUNY-DMC are distinct entities, the court refers to both as "SUNY-DMC" for the duration of this opinion, except where necessary to distinguish between the two.

Defendants' motion is GRANTED IN PART and DENIED IN PART, PMA's motion is GRANTED, and Dooley's motion is GRANTED.

## I.    BACKGROUND

The court takes the following statement of facts largely from Plaintiff's SAC, the well-pleaded allegations of which the court generally accepts as true for purposes of the motions to dismiss.  See <u>N.Y. Pet Welfare Ass'n v. City of New York</u>, 850 F.3d 79, 86 (2d Cir. 2017).[2]

### A.    Facts

#### 1.    <u>Parties</u>

##### a.    *Plaintiff*

Plaintiff is a self-identified Orthodox Jewish woman who has worked at SUNY-DMC as a computer programmer since May 1, 2008.  (SAC ¶ 14.)  During her tenure at SUNY-DMC, "Plaintiff has garnered praise from both supervisors and clients for her excellent work product and results." (<u>Id.</u> ¶ 15.)  As an example of how she has "contributed to the organization in a manner that was recognized as especially valuable," Plaintiff notes that, "during a layoff in 2013, she was retained as an essential worker." (<u>Id.</u> ¶ 16.)  Her current title is "SL4 Sr. Programmer/Analyst" in SUNY-DMC's Information Technology ("IT") Department.  (<u>Id.</u>)

##### b.    *Defendants*

SUNY, a defendant in this suit, "is New York's state-created public university system, established under the State Education Law." (State Mem. in Supp. of Mot. to Dismiss ("State Mem.") (Dkt. 67) at 3.)  SUNY-DMC, at which Plaintiff is employed, is a "not-for-profit medical corporation and an entity of the State of New York" located in Brooklyn, New York.

---

[2] While Defendants filed their fully briefed motions when the operative complaint was Plaintiff's first amended complaint (<u>see</u> 1st Am. Compl. (Dkt. 29)), the court considers their motions to have been updated to seek dismissal of the SAC, which, as set forth above, does not differ in substance from the first amended complaint.

(SAC ¶ 25.) SUNY-DMC has a staff of approximately 8000 employees. (Id.) SUNY-DMC is a recipient of federal funds. (Id. ¶ 26.)

PMA is a Louisiana corporation that contracts with the State of New York to provide staff and services to SUNY-DMC. (Id. ¶ 35.) Pursuant to PMA's contract with SUNY-DMC, "staff provided to SUNY-DMC by PMA are employees of PMA." (Id. ¶ 36.) The contract requires that PMA and its employees "comply with the provisions of all municipal, state and federal laws," including antidiscrimination laws. (Id. ¶ 37.)

Pursuant to the contract with PMA, SUNY-DMC hired Dooley to serve as its Chief Information Officer ("CIO") and Director of IT. (Id. ¶ 27.) Dooley served in this capacity from May 2013 until his resignation in November 2015. (Id. ¶ 17.) In this capacity, Dooley "was required to perform services as directed by SUNY-DMC." (Id. ¶ 28.) SUNY-DMC had the right to hire and fire Dooley. (Id. ¶ 29.) SUNY-DMC required Dooley to be physically present onsite at SUNY-DMC for at least 40 hours per week. (Id. ¶ 30.) SUNY-DMC required Dooley to "submit to all SUNY-DMC Health protocols" and to "undergo SUNY New Employee Onboarding." (Id. ¶¶ 31-32.) SUNY-DMC provided Dooley with an onsite computer, office, and supplies. (Id. ¶ 33.) PMA, meanwhile, "wrote checks to [Dooley] for his services; reimbursed him for his expenses incurred while employed by SUNY-DMC, and provided him with a computer office and supplies," as well as business cards. (Id. ¶¶ 38-39.) Dooley remained "subject to all PMA policies and procedures." (Id. ¶ 40.) During Dooley's tenure at SUNY-DMC, "PMA, 'in coordination with the President of SUNY[-]DMC,' shared oversight of Dooley." (Id. ¶ 41.) Dooley "exercised control over SUNY-DMC's staff in his charge as Director of IT and CIO, including approving staff raises and directing their work, including that of Plaintiff." (Id. ¶ 50.)

Nath is an employee of SUNY-DMC who "exercised control over Plaintiff" approximately from November 2015 until November 2016. (Id. ¶ 54-55.) At that time, Nath was Associate Vice President and Deputy CIO. (Id. ¶ 55.)

Clenman is the Project Manager of the Revenue Cycle Group at SUNY-DMC who became Plaintiff's supervisor on or about December 20, 2016. (Id. ¶ 52.)

Sookhoo has been employed by SUNY-DMC as its Vice President and CIO from approximately November 2016 until the present day. (Id. ¶ 57.) Sookhoo has also supervised Plaintiff during this period of time. (Id. ¶ 23.)

2.    Facts Relevant to Plaintiff's Allegations

The SAC contains a voluminous section of factual allegations concerning Plaintiff's various claims against all of the defendants. (See id. ¶¶ 59-246.) While the court has attempted to separate these allegations by cause of action, the court recognizes that some of the factual allegations relate to multiple of Plaintiff's causes of action; the categorization of these claims in this section is not intended to constrain their treatment in the legal analysis section of this memorandum and order.

a.    *Pay Discrimination (SUNY-DMC)*

Plaintiff has worked in SUNY-DMC's "IT Department as a computer programmer in a team of programmers in the Revenue Cycle Applications Group [(the "RCAG")] responsible [for] support[ing] a mainframe system called Eagle."[3] (Id. ¶ 61.) Since the start of Plaintiff's employment in May 2008, Plaintiff alleges that "all the male members of the Revenue Cycle Application Group in the category SL4 have had higher salaries than any female member of the group." (Id. ¶ 62.) She states that the salaries of the male SL4 employees in the RCAG range

---

[3] Although Plaintiff uses the past tense in this factual allegation, she is still employed at SUNY-DMC. Accordingly, the court is unsure whether Plaintiff is still a programmer in the RCAG.

from $85,000 to $111,822, while the salaries of the female SL4 employees in the RCAG range

from $82,464 to $107,600. (Id.) Plaintiff alleges that this pay disparity exists "even after

factoring in tenure" and despite the fact that, on average, the female employees of the RCAG

"have higher education than the male members of the group." (Id. ¶¶ 63-64.) She adds that this

pay disparity "does not exist by reason of the contract governing pay of SUNY-DMC

employees." (Id. ¶ 65.)

Plaintiff alleges that she "is the only employee who is proficient in all aspects of her

group's responsibilities and [that] she was requested at various points to take on responsibilities

of male colleagues who earned salaries approximately [50%] higher than hers." (Id. ¶ 68.)

Nevertheless, after taking on these responsibilities, Plaintiff continued to receive a "low salary

because of her gender." (Id. ¶ 69.) Plaintiff maintains that she is "similarly situated to those

male coworkers whose work she performed in every way but her pay bracket." (Id. ¶ 70.)

Plaintiff points to a male employee who started at SUNY-DMC six months before Plaintiff and

was promoted to the SL4 level ten months after Plaintiff was hired as an SL4. (Id. ¶ 73.)

According to the last annual salary report, Plaintiff's male comparator earns $99,783 while

Plaintiff earns $88,363. (Id.) Plaintiff maintains that this disparity cannot "be accounted for by

education as Plaintiff and [the] comparator have the same educational level." (Id.) She further

states that her pay bracket should not be "an impediment to her receiving a substantial raise since

her salary has not reached the top of her pay bracket." (Id. ¶ 71.) Plaintiff alleges that she "has

repeatedly requested raises and been rebuked." (Id. ¶ 74.)

> b.    *Fraudulent Inducement (Dooley and PMA)*

At some point in 2013, Plaintiff asked SUNY-DMC for a raise. (Id. ¶ 92.) In August

2013, Plaintiff reached an agreement with SUNY-DMC, through Dooley, to increase her salary

to $105,000, "still lower than many of her male colleagues." (Id.)  She only obtained this raise after telling Dooley that she was offered a job with Allscripts Inc. with an annual salary of $120,000.  (Id.)

Plaintiff believes that Dooley offered her the raise "to keep her from leaving SUNY-DMC . . . because she is an extremely valuable employee and he wanted to maintain her in her low-paying position."  (Id. ¶ 94.)  Dooley, however, "had no intention of giving [Plaintiff] this raise" when he made the offer.  (Id. ¶ 93.)  Once Plaintiff declined the offer from Allscripts, "Dooley refused to pay her what they had agreed on."  (Id. ¶ 95.)  Plaintiff delivered the paperwork for the promised raise to SUNY-DMC Chief Financial Officer David Ho, who signed the paperwork and sent it to Human Resources.  (Id. ¶¶ 97-98.)  The paperwork was then sent to Dooley, who "never processed it" even though he told Plaintiff that he had sent the paperwork to SUNY-DMC Chief Operating Officer Astra Bain-Dowell for her signature."  (Id. ¶¶ 99, 101.)  Plaintiff claims that Dooley's retired secretary told Plaintiff that she saw the paperwork for Plaintiff's raise sitting on Dooley's desk, unsigned.  (Id. ¶ 99.)  On information and belief, Plaintiff alleges that Dooley "intentionally stopped the processing of Plaintiff's raise with COO Bain-Dowell and Human Resources."  (Id. ¶ 102.)

> ### c.     Anti-Semitic Discrimination (Dooley and PMA)

Plaintiff alleges that when "Dooley took the helm of the IT department" in May 2013, "he systematically began instituting a series of demotions among his Jewish staff."  (Id. ¶¶ 75-76.)  As an example, Plaintiff points to Joel Stern—no relation to Plaintiff—an Orthodox Jewish manager in the IT department whom Plaintiff alleges was "forced out" by Dooley.  (Id. ¶ 77; accord id. ¶ 121.)  Plaintiff alleges that Dooley began to remove Joel Stern's direct reports in 2013 and moved them to a non-Jewish manager (Defendant Nath) "entirely without Joel Stern's

knowledge." (Id. ¶ 78-79.)  Plaintiff also claims that Dooley offered Joel Stern's position to another, non-Jewish employee, who later reported the offer to Joel Stern. (Id. ¶¶ 81-82.) Plaintiff also alleges that on or about May 2014, Dooley relieved two other Orthodox Jewish employees, Israel Chait and Defendant Clenman, of many of their managerial duties. (Id. ¶ 85; accord ¶¶ 119-20.)  In all, Plaintiff claims that Dooley took adverse employment actions against five Orthodox Jewish employees in the IT Department. (Id. ¶¶ 86-87.)

Plaintiff alleges that Dooley exhibited anti-Semitic animus in other respects as well.  On one occasion in 2013, Dooley allegedly asked her what the "boychiks" were up to, using a Jewish term of endearment for a young boy or young man to refer to Chait and Clenman. (Id. ¶ 89.)  Plaintiff also alleges that Dooley asked his secretary "to audit the timesheets of all Jews after the religious holidays to ensure they did not use 'sick' days on such religious holidays." (Id. ¶ 91.)  Additionally, Plaintiff alleges that Dooley exhibited anti-Semitic bias when he passed over her and an Orthodox Jewish colleague (Riva Stockhammer) for an open supervisory position in order to hire an outside applicant of unspecified religion. (Id. ¶¶ 122-27.)  The position for which Plaintiff and Stockhammer had applied was covered by SUNY-DMC's union contract, and thus "gave preference to internal applicants, opening up applications to outside candidates only after an internal candidate search had failed." (Id. ¶ 125.)  Even though Plaintiff was qualified for the job, "SUNY hired an outside female candidate whose skill set did not include those that were ostensibly lacking in the internal Jewish candidates, thus rendering SUNY-DMC's reasons for the rejection of qualified Jewish internal applicants pretextual." (Id. ¶ 126.)  Finally, Plaintiff alleges that Dooley's refusal to pay Plaintiff her promised raise, as discussed above, was motivated by anti-Semitic animus. (Id. ¶¶ 95-96, 103-04.)

d.      *Retaliation (SUNY-DMC, Dooley, and PMA)*

i.      <u>Retaliation in Response to Plaintiff's Internal Complaints</u>

On or about January 24, 2014, having received no raise or further updates about the processing of her raise paperwork, Plaintiff sent an email to Leonzo Cuiman in SUNY-DMC's Department of Labor Relations complaining about the gender and religious discrimination to which she was allegedly subjected. (<u>Id.</u> ¶ 105.) Plaintiff believes that "the substance of this complaint" was shared with Dooley and Israel Chait, one of the employees against whom Dooley had allegedly discriminated. (<u>Id.</u> ¶ 106.) Plaintiff never received a response to her email but, a few days after she sent it, the Department of Labor Relations "opened a retaliatory and spurious insubordination investigation into [her]." (<u>Id.</u> ¶ 107-08.) On February 7, 2014, Plaintiff was "interrogated" by Labor Relations and "threatened with discipline for raising her desire to discuss the substance of her discrimination complaint." (<u>Id.</u> ¶ 109.) "Although the interrogation did not lead to any formal discipline, over the course of the next three months Defendants SUNY-DMC and Dooley continued their retaliation against Plaintiff in the form of excessive monitoring and scrutiny of Plaintiffs time and attendance records." (<u>Id.</u> ¶ 110.) For example, on or about April 25, 2014, Chait sent an email to Plaintiff, blind-copying Dooley, in which he said that he had performed spot checks on staff attendance. (<u>Id.</u> ¶ 111.) In fact, Plaintiff alleges, Chait had only performed such checks on Plaintiff. (<u>Id.</u>) On information and belief, Plaintiff alleges that Chait "misinformed his other staff" four days later that he had "performed attendance spot checks on all staff, while continuing to target only Plaintiff." (<u>Id.</u> ¶ 112.) On or about May 6, 2014, Chait "requested a counseling memorandum to be placed on Plaintiff's file, tainting her file." (<u>Id.</u> ¶ 113.) That same day, SUNY-DMC closed its investigation into Plaintiff, "finding no insubordination." (<u>Id.</u> ¶ 114.) This alleged retaliation so distressed Plaintiff that in late April or early May 2014, she again sought employment with Allscripts. (<u>Id.</u> ¶ 115.) Plaintiff then

learned that Defendants had called the person who previously offered Plaintiff the job at Allscripts "and admonished him and his company not to offer Plaintiff employment." (Id. ¶ 116.) Later that year, Plaintiff gave birth and took FMLA leave until May 2015. (Id. ¶ 128.) During her maternity leave, Plaintiff was repeatedly asked for additional documentation to confirm the birth of her child, something which Plaintiff believed was further retaliation for her January 2014 complaint letter. (Id. ¶ 129.) In March 2015 Plaintiff filed a grievance, claiming that these requests "amounted to retaliation or pregnancy discrimination"; nevertheless, SUNY-DMC continued to request further medical documentation regarding Plaintiff's leave into May and June 2015. (Id. ¶¶ 131-32.)

On August 11, 2015, Plaintiff sent another letter to SUNY-DMC's General Counsel complaining of retaliation and discrimination. (Id. ¶ 134.) On information and belief, Plaintiff states that the letter only reached the General Counsel's office after it had been opened in the IT Department. (Id. ¶ 136.) On August 14, 2015, Clenman called Plaintiff into a meeting in which he "made reference to a voice recording 'app' and attempted to induce [Plaintiff] to say that she had no problems at SUNY." (Id. ¶ 137.) The meeting was "so intense" that Clenman asked Plaintiff to close the door so they could discuss the matter privately. (Id. ¶ 138.) Plaintiff believed that Chait and Dooley had put Clenman "up to the ruse in order to fraudulently produce evidence that might be used in their defense." (Id. ¶ 139.) Plaintiff alleges that, at the time, both Chait and Clenman "wanted to curry favor with Dooley in the hopes of avoiding further demotions." (Id.) Following her meeting with Clenman, Plaintiff believed that members of the IT Department "had knowledge of the content of the letter and were attempting to both intimidate her and to induce her to impeach her claims." (Id. ¶ 140.) SUNY-DMC's General Counsel responded to Plaintiff's letter on August 21, 2015, "denying the existence of

discrimination and denigrating Plaintiff's qualifications." (Id. ¶ 141.) Two weeks after Plaintiff

sent her letter to the General Counsel, she arrived at work to discover that a "search performed

on her computer" had been "left open" on her computer screen. (Id. ¶ 143.) While Plaintiff does

not specify the substance of this "left open search," she does allege, upon information and belief,

that Defendants "had searched her cache of search engine queries." (Id. ¶ 144.) Following this

"harassment and retaliatory treatment," Plaintiff filed another grievance with her union. (Id.

¶ 148.)

ii.    Retaliation in Response to Plaintiff's Legal Actions

On October 9, 2015, Plaintiff filed an EEOC charge against SUNY-DMC and PMA,

alleging retaliation and discrimination based on sex, religion, and race. (Id. ¶ 150.) In

November 2015, Dooley resigned, leading to the takeover of his role by Nath and a new round of

allegedly retaliatory acts. (Id. ¶¶ 151-52.) One round of acts concerns performance reviews of

Plaintiff given by her former supervisor, Susann Lambkin. In January 2016, Lambkin gave

Plaintiff a copy of a recent review that Lambkin had done of Plaintiff, telling Plaintiff that Nath

found it to be "too positive" and that he had ordered her to revise it to be more negative. (Id.

¶ 154.) In February 2017, Plaintiff received a "revised" 2016 evaluation from Lambkin that was

"less positive" than the original evaluation. (Id. ¶ 216; see id. ¶ 196.) Plaintiff alleges that the

added negative comments were made at the behest of Nath and Clenman due to their retaliatory

animus against her. (Id. ¶ 218.) Plaintiff further alleges that Clenman had previously told her

that Lambkin's 2016 review was only positive "by the grace of god." (Id. ¶ 202.)

Additionally, in February 2016, Plaintiff took FMLA leave after being diagnosed with a

serious illness. (Id. ¶ 158.) After six weeks, with her FMLA leave time running out, Plaintiff

sought to return to work with an accommodation of telecommuting. (Id. ¶ 159.) Plaintiff

10

attempted to secure a timely extension of her FMLA leave to ensure there would be no gap between the end of her leave and the beginning of any accommodation, but SUNY-DMC denied the extension and delayed responding to her accommodation request. (Id. ¶¶ 161-63.) After Plaintiff's attorney threatened filing suit with the EEOC if the accommodation was not made, SUNY-DMC granted the accommodation. (See id. ¶¶ 166-67.)

All other instances of alleged retaliation occurred after Plaintiff filed her original complaint with this court on October 9, 2016. First, on November 6, 2016, Plaintiff was invited to interview for a promotion to the position of Project Manager; Plaintiff had first applied for this position on June 6, 2016. (Id. ¶¶ 169-71.) On November 17, 2016, Nath interviewed Plainitff for the Project Manager opening. (Id. ¶ 172.) Nath told Plaintiff that he had not originally invited her to interview for the position "because the job description had been changed." (Id. ¶ 173.) On December 23, 2016, Plaintiff was told that Clenman—a male who does not suffer from any disability, and whom Plaintiff alleges was less qualified than she—had received the Project Manager position. (Id. ¶¶ 174-75.)

In late December 2016, Sookhoo reorganized the IT Department so that Plaintiff started reporting to Clenman, rather than Lambkin. (Id. ¶ 179.) On or about December 15, 2016, Nath and Sookhoo began an audit of Plaintiff's timesheets, which Plaintiff later learned would cover the entire time she had been telecommuting. (Id. ¶¶ 182-83.) On information and belief, Plaintiff submits that no other member of her cohort in the IT Department was subjected to such an audit. (Id. ¶ 184.) Later that month, on or about December 23, 2016, Plaintiff received a copy of the IT Department organizational chart; it listed her under the title "Report Writer," a different title from the "senior programmer analyst" title under which she was hired. (Id. ¶¶ 188-89.) When Plaintiff brought this issue to the attention of SUNY-DMC management, they stated

that it was an error and conceded that "report writer" is a lesser position than "senior program analyst"; nevertheless, Plaintiff's name was listed with the lesser title for several months. (Id. ¶¶ 191-92.) In January 2017, Plaintiff alleges that Clenman began writing Plaintiff disciplinary reprimands—with copies sent to senior management, including Nath and Sookhoo—in which he "misrepresented" her work. (Id. ¶ 195.) Clenman claimed that the "Business Office" had made "numerous complaints" about her, but Plaintiff contacted the Business Office and was told that no such complaints had been made. (Id. ¶¶ 197-98.)

Also in January 2017, Plaintiff alleges that Clenman assigned her a substantially larger amount of his former responsibilities. (Id. ¶ 210.) The following month, Clenman requested that Plaintiff start monitoring and reporting her tasks through a program called Sametime as a condition of her telecommuting accommodation. (Id. ¶ 224.) Finally, in February 2017, as discussed previously, Plaintiff received a "revised" 2016 evaluation from Lambkin that was "less positive" than the original evaluation. (Id. ¶ 216.)

          *e.*      *Gender and Disability Discrimination (State Defendants)*

The SAC contains numerous factual allegations, some of which have been extensively discussed above, relevant to Plaintiff's additional claims of disability and gender discrimination. The court repeats them here as necessary.

In early 2016, SUNY-DMC denied Plaintiff an extension of her FMLA leave and declined to grant her a telecommuting accommodation until her attorney threatened to file charges with the EEOC. (See id. ¶¶ 158-68.) Plaintiff also alleges that the December 2016 decision to promote Clenman—a male who does not suffer from any disability, and whom Plaintiff alleges was less qualified than she for the Project Manager position—over Plaintiff constitutes gender discrimination. (Id. ¶¶ 174-76.) In January 2017, after his promotion, Clenman "disproportionately" assigned many of his former responsibilities to Plaintiff. (Id.

¶¶ 206-10.)  The following month, Clenman requested that Plaintiff start monitoring and reporting her tasks through a program called Sametime as a condition of her telecommuting accommodation.  (Id. ¶ 224; see id. ¶ 238.)  Plaintiff alleges that male staff members in her department who telecommute are not required to submit to monitoring by Sametime.  (Id. ¶ 225.)

Upon information and belief, Plaintiff states that "SUNY's agents believe that female telecommuters do not work" when they are home, "but rather attend to domestic tasks." (Id. ¶ 229.)  She alleges that "SUNY treats male telecommuters more favorably than female telecommuters based on their gender." (Id. ¶ 230.)  Plaintiff states that, on information and belief, Sookhoo has admitted to employees that he is in the process of implementing a ban on the telecommuting accommodation and that he intends to impose this ban exclusively on SUNY-DMC's female staff members.  (Id. ¶ 232.)  Sookhoo previously emailed Plaintiff to inform her that, "It appears working from home is very challenging, so hopefully you will be able to return to work soon." (Id. ¶ 231.)  Plaintiff avers that Sookhoo's ban on telecommuting violates the Rehabilitation Act and that its gendered implementation violates Title VII. (Id. ¶ 233.)  Plaintiff believes that "Defendants are attempting to make it untenable for Plaintiff to remain in her position" and that Nath, Sookhoo, and Clenman "have subjected Plaintiff and other female faculty who telecommute as an accommodation under the Rehabilitation Act to a severe and pervasive environment of discriminatory intimidation, ridicule, and insult altering the terms and conditions of her employment." (Id. ¶¶ 234-36.)  Two staff members at the Business Center previously told Plaintiff that they preferred it if she performed her work onsite, at her desk; Plaintiff alleges that these staff members were repeating "nearly verbatim statements" made by Clenman, who "had almost never stopped by Plaintiff's desk when she worked onsite." (Id. ¶ 199.)

13

Around this same time, Plaintiff had to fill out a "work assignment document that subjected Plaintiff to greater scrutiny and documentation standards than others in her group." (Id. ¶ 201.) Clenman told Plaintiff that her counsel had agreed to this document with counsel for SUNY-DMC, but Plaintiff alleges that "Clenman had surreptitiously added an additional column to the document in question and yet sought to pass the document off as one that Plaintiff's attorneys had consented to." (Id.) Plaintiff alleges that no other member of the RCAG is required to produce productivity spreadsheets. (Id. ¶ 212.)

f.   Harm

Plaintiff claims that she "has suffered and continues to suffer emotional distress as a result of Defendants' deliberate discriminatory and retaliatory actions." (Id. ¶ 244.) She alleges that "the chronic illness" with which she was diagnosed around May 2016, "during the course of the retaliation," "has been exacerbated by the severe stress caused by Defendants' actions." (Id. ¶ 245.) "Plaintiff continues to fear ongoing retaliation and discrimination and has been humiliated and frustrated by the unlawful barriers to her professional advancement placed in her way by Defendants." (Id. ¶ 246.)

B.   Procedural History

On October 9, 2015, Plaintiff filed an EEOC charge against SUNY-DMC and PMA, alleging retaliation and discrimination based on sex, religion, and race. (Id. ¶ 150.) SUNY-DMC submitted its response to the EEOC charge on February 3, 2016. (Id. ¶ 157.) Plaintiff subsequently received a notice of her right to sue dated July 8, 2016. (Id. ¶ 13.)

Plaintiff filed her original complaint with this court on October 6, 2016. (Compl. (Dkt. 1).) PMA answered the complaint on December 29, 2016. (PMA Answer (Dkt. 17).) Separately, the State Defendants and Dooley requested a pre-motion conference in anticipation

of seeking leave to file a motion to dismiss.  (Jan. 13, 2017, State Defs. Letter (Dkt. 19); Jan. 23,

2017, Dooley Letter (Dkt. 22).)  Because PMA had already filed an answer, it requested a pre-

motion conference in anticipation of seeking leave to move for judgment on the pleadings.

(Jan. 23, 2017, PMA Letter (Dkt. 23).)  At the pre-motion conference on February 14, 2017, the

court granted Plaintiff leave to amend her complaint.  (Feb. 14, 2017, Min. Entry.)

    Plaintiff filed her first amended complaint (the "FAC") on March 13, 2017.  (1st Am.

Compl. (Dkt. 29).)  All defendants, including PMA, sought leave to dismiss the FAC.  (Apr. 4,

2017, State Defs. Letter (Dkt. 33).)  The court granted the request and set a briefing schedule.

(Apr. 13, 2017, Order.)  Following various extensions of time, Dooley, PMA, and the State

Defendants separately filed their fully briefed motions to dismiss on September 15, 2017.  (See

Dooley Mot.; PMA Mot.; State Mot.)

    In their motion to dismiss, the State Defendants claimed that Plaintiff's allegations

regarding SUNY-DMC's alleged failure to promote and alleged hostile work environment were

based on facts that occurred after Plaintiff brought her original EEOC charge, and thus barred by

her failure to exhaust administrative remedies.  (State Mem. at 10-11.)  Plaintiff subsequently

timely amended and updated her EEOC charge alleging all of the claims asserted in the FAC,

and received notice of her right to sue on January 26, 2018.  (SAC ¶ 13.)  On April 20, 2018,

with the motion having been fully briefed for over seven months, Plaintiff timely requested leave

of the court to amend the FAC to include reference to the new right-to-sue letter.  (Apr. 20, 2018,

Pl. Letter (Dkt. 75).)  The court granted Plaintiff's request on April 30, 2018 (Apr. 30, 2018,

Order), and Plaintiff filed the SAC later that day.  The State Defendants submitted a

supplemental memorandum of law in support of their motion to dismiss.  (State Defs. Suppl.

Mem. (Dkt. 83).)

## II.    LEGAL STANDARD

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112-13 (2d Cir. 2007).  A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

When considering a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005).

## III.    DISCUSSION

All defendants have moved to dismiss all parts of Plaintiff's case relevant to each defendant.  For the following reasons, the court dismisses all of Plaintiff's claims except for some of her claims of retaliation against SUNY-DMC under Title VII and the Rehabilitation Act.

### A.    Discrimination Claims

At the motion-to-dismiss stage, a plaintiff asserting a discrimination claim "benefits from the temporary presumption" of discriminatory motivation. Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015).  The plaintiff can meet her "minimal burden to show

16

discriminatory intent" by "plausibly" alleging that she "is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." Id. Phrased otherwise, the plaintiff "in an employment discrimination case . . . must plausibly allege that (1) the employer took adverse action against [her] and (2) [her] race, color, religion, sex, [disability,] or national origin was a motivating factor in the employment decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015); see Thomson v. Odyssey House, No. 14-CV-3857 (MKB), 2015 WL 5561209, at *16 (E.D.N.Y. Sept. 21, 2015) (applying the Vega formulation of the motion-to-dismiss standard to a claim for disability discrimination). In pleading discriminatory motivation, the plaintiff may "rely on bits and pieces of information to support an inference of discrimination, i.e., a mosaic of intentional discrimination." Vega, 801 F.3d at 86 (citation and internal quotation marks omitted).

Plaintiff brings three counts of discrimination in violation of federal law. Against SUNY-DMC, Plaintiff asserts gender discrimination in violation of Title VII and disability discrimination in violation of the Rehabilitation Act. (SAC ¶¶ 240-53, 272-93.) Against Dooley and PMA, Plaintiff asserts racial and religious discrimination in violation of § 1981. (Id. ¶¶ 254-58.)

1.    Gender Discrimination Claims Against SUNY-DMC

Under Title VII, an employer may not discriminate in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff articulates three claims of gender discrimination under Title VII: (1) that SUNY-DMC pays her less than her male counterparts because of her gender; (2) that SUNY-DMC failed to promote her because of her gender; and (3) that SUNY-

17

DMC has created a hostile work environment for female employees. Title VII has been interpreted to encompass claims of pay discrimination, failure to promote, and hostile work environment. See, e.g., Littlejohn, 795 F.3d at 320 (hostile work environment); Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004) (failure to promote); Belfi v. Prendergast, 191 F.3d 129, 139 (2d Cir. 1999) (pay discrimination).

For the reasons that follow, the State Defendants' motion to dismiss is granted with respect to all of Plaintiff's claims of gender discrimination against SUNY-DMC.

            a.       *Pay Discrimination*

"In order to make out a prima facie case of unequal pay for equal work under Title VII, a plaintiff must show that (1) she is a member of a protected class; and (2) she was paid less than non-members of her class for work requiring substantially the same responsibility." Belfi, 191 F.3d at 139 (citation omitted). The requirements for pleading a Title VII pay-discrimination claim are "generally the same" as those under the Equal Pay Act, except that the Title VII plaintiff "must also produce evidence of discriminatory animus." Id. (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995)). Thus, in addition to showing animus, the Title VII plaintiff must show that she and employees of the opposite sex "perform equal work on jobs requiring equal skill, effort, and responsibility" and that "the jobs are performed under similar working conditions." EEOC v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 254-55 (2d Cir. 2014). "While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" Id. at 255. "[B]road generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice." Id.

18

at 256; see Bass v. World Wrestling Fed'n Entm't, Inc., 129 F. Supp. 2d 491, 503 (E.D.N.Y. 2001).

The State Defendants argue that Plaintiff's pay-discrimination claim must be dismissed because she does not sufficiently allege "how her position and the comparison positions [a]re substantially similar." (State Mem. at 7 (quoting Hughes v. Xerox Corp., 37 F. Supp. 3d 629, 645 (W.D.N.Y. 2014)).) The State Defendants are correct. While Plaintiff identifies a direct male comparator—"a male employee who started at SUNY-DMC six months before Plaintiff and was promoted to the title of SL4 ten months after Plaintiff's hiring as an SL4" and who, according to the "last available salary reports[,] . . . earns $99,783 while Plaintiff earns $88,363" (SAC ¶ 73)—she does not provide any information about the comparator's job responsibilities and how they relate to her own. A plaintiff pleading a Title VII pay-discrimination claim must make "specific allegations" regarding the "actual job duties" performed by the plaintiff and similarly situated employees. Port Auth. of N.Y. & N.J., 768 F.3d at 257. The plaintiff may not, however, rest on "broad generalizations drawn from job titles, classifications, or divisions." Id. at 256. Here, Plaintiff does not specify any job duties of the male comparator except that he, like Plaintiff, works in the RCAG and is responsible for supporting the Eagle mainframe system. (SAC ¶ 61; see State Mem. at 9.) She only alleges that, compared to male colleagues in the RCAG whose responsibilities she has allegedly taken on, she is "similarly situated . . . in every way but her pay bracket." (SAC ¶¶ 68-70.) The court is unable to conclude that Plaintiff is discriminated against with respect to her pay when compared to any male who performs substantially the same responsibilities as she does, and so her pay-discrimination claim must be dismissed.

b.    *Failure to Promote and Hostile Work Environment*

i.    Statute of Limitations

As a preliminary matter, the State Defendants argue that the court should dismiss Plaintiff's failure-to-promote and hostile-work-environment claims because she has failed to exhaust her administrative remedies.  The State Defendants included this argument in their original motion to dismiss, stating that Plaintiff's failure to include any information about these claims in her EEOC charge precluded her from bringing them in federal court.  (State Mem. at 10-11.)  Since then, however, Plaintiff has amended her EEOC charge to include all claims asserted in her federal lawsuit, and received an updated right-to-sue letter on January 26, 2018.  (SAC ¶ 13.)  On April 20, 2018, Plaintiff requested leave to amend her complaint to include this information.  (Apr. 20, 2018, Pl. Letter.)  After limited briefing, the court granted Plaintiff's motion and the SAC was filed on April 30, 2018.  (See SAC.)  As the State Defendants point out, according to Plaintiff's pleadings, she amended her complaint 94 days after receiving the right-to-sue letter; however, Title VII generally requires a plaintiff to file an action in federal court within 90 days of receiving a right-to-sue letter from the agency.  (State Defs. Suppl. Mem. at 4.) See Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 525 (2d Cir. 1996) (citing 42 U.S.C. § 2000e-5(f)(1)) ("In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter.").

Plaintiff's failure-to-promote and hostile-work-environment claims are not precluded on limitations grounds.  The court first notes that the 90-day requirement is "not a jurisdictional requirement," but is instead "treated as a statute of limitations and is subject to claims of waiver, equitable estoppel and equitable tolling."  Smith v. Henderson, 137 F. Supp. 2d 313, 317 (S.D.N.Y. 2001); accord Ko v. JP Morgan Chase Bank, N.A., 730 F. App'x 62, 63 (2d Cir. 2018)

(summary order). While the court's "power to toll the limitations period is not absolute," Smith, 137 F. Supp. 2d at 317, the court may toll the limitations period if, among other reasons, "the court has led a plaintiff to believe she has done everything required of her." Foster v. Walgreen Co., 12 F. Supp. 3d 615, 618 (W.D.N.Y. 2014). Such an exercise of discretion is appropriate here. Six days prior to the expiration of the limitations period, Plaintiff requested leave of the court to file her SAC. (See Apr. 20, 2018, Pl. Letter.) The court subsequently ordered Defendants to respond by no later than April 26, 2018—the date on which the limitations period expired—and, on April 30, 2018, the court granted Plaintiff leave to amend. Plaintiff filed her SAC later that day. Any failure on the part of Plaintiff to file the SAC within the 90-day period is thus excused as attributable to the court's mandated briefing schedule.

ii.    Failure to Promote

"To establish a prima facie case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Petrosino, 385 F.3d at 226 (citation and internal quotation marks omitted). "With regard to the fourth prong of this test, the Second Circuit has held that an inference of discrimination may be drawn either from (1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that 'she was subject to disparate treatment compared to persons similarly situated to herself.'" Falu v. County of Orange, No. 16-CV-448 (NSR), 2017 WL 2889513, at *6 (S.D.N.Y. June 30, 2017) (alterations adopted) (internal quotation marks omitted) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). "In the context of a promotion, that means comparing the qualifications of the

21

plaintiff with those of the person promoted." Martinez v. Davis Polk & Wardwell LLP, 208 F.

Supp. 3d 480, 487 (S.D.N.Y. 2016).

Although Plaintiff seems to tie Count I of the SAC to the denial of multiple "promotions"

(SAC ¶ 251), the only sex-based failure to promote she alleges is SUNY-DMC's decision not to

appoint her to the Project Manager position for which she applied in June 2016.  (See id. ¶ 176.)

Nath interviewed Plaintiff for this position on November 17 of that year, and on December 23,

Plaintiff learned the position had gone to Clenman, a male colleague.  (Id. ¶¶ 172, 174.)  Plaintiff

alleges she was "more qualified for the position" than Clenman and that SUNY-DMC "failed to

promote her because of her gender."  (Id. ¶¶ 175-76.)

Plaintiff's allegations cannot survive a motion to dismiss.  Assuming that Plaintiff has

pleaded the first and third elements of the prima facie case for failure to promote, she has still

failed to sufficiently allege the second or fourth elements: she has not established that she was

qualified for the position, nor has she shown that she was subject to disparate treatment

compared to similarly situated persons.  As to her qualifications, Plaintiff simply states that she

was "qualified for the position."  (Id. ¶ 175.)  She does not set forth the qualifications expected

of applicants for the Project Manager position or what relevant skills she had that made her

qualified for the position.  In one post-Littlejohn case, the district court found that a plaintiff had

provided sufficient facts to establish his qualifications where he provided the court with

commendations he had received, training courses he had taken, complimentary letters about him,

and his disciplinary history.  See Feliz v. Metro. Trans. Auth., No. 16-CV-9555 (ER), 2017 WL

5593517, at *5 (S.D.N.Y. Nov. 17, 2017).  While the court did note that it was important that the

plaintiff "was in fact interviewed" for the position to which he sought a promotion, it only

concluded that he had established his prima facie case of failure to promote in light of the other

allegations regarding his qualifications.  Id.  Here, while Plaintiff was interviewed for the Project Manager, she has provided the court with no other information about the position or her qualifications.  The court cannot say that she was unqualified for the position, but it also cannot say she was qualified for it within the meaning of the law.

As for the disparate treatment element, Plaintiff merely states that Clenman "is a male who does not suffer from any disability" and that Plaintiff "was . . . more qualified for the position."  (Id. ¶¶ 174-75.)  Her complaint lacks any information that would allow the court to consider whether she was similarly situated to Clenman:  She does not provide a listing of "the qualifications expected of applicants for that position," nor does she state either her or Clenman's qualifications for the position.  Cf. Wheeler v. Bank of N.Y. Mellon, 256 F. Supp. 3d 205, 217 (N.D.N.Y. 2017).  Such information is not always required, but its absence is only overlooked if the plaintiff has plausibly alleged discrimination in another compelling manner. So, in Falu, the district court denied the motion to dismiss even though the plaintiff simply alleged that she was "better qualified [for a position as a police sergeant] than at least some of the males promoted" because the plaintiff had also presented much stronger circumstantial evidence of discrimination than in this case.  2017 WL 2889513, at *7.  There, the plaintiff ranked in the top twenty candidates for a sergeant promotion, and was one of the top three women on the eligibility list; nevertheless, the defendants gave the sergeant position to "twenty other male employees" and, during the relevant period, failed to promote "any of the [10] qualified females from the eligibility list to the rank of sergeant."  Id.  Plaintiff marshals no such evidence in her favor, asserting instead—without any additional supporting information—that she was "more qualified" than Clenman.  (SAC ¶ 175.)  These allegations fall well short of what is needed to survive a motion to dismiss a failure-to-promote claim.

### iii.   Hostile Work Environment

"To establish a hostile work environment under Title VII . . . , a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320-21 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "The laws do not reach 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex'; instead, they forbid 'only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.'" Lenart v. Coach Inc., 131 F. Supp. 3d 61, 66 (S.D.N.Y. 2015) (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998)). "Such a showing requires a plaintiff to identify incidents that are more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Pouncy v. Advanced Focus LLC, No. 15-CV-6260 (JMF), 2017 WL 4280949, at *5 (S.D.N.Y. Sept. 25, 2017), appeal filed, No. 17-3455 (2d Cir. Oct. 26, 2017). "Moreover, the incidents must show that the employer discriminated against the employee 'because of [the employee's] race, color, religion, sex or national origin.'" Id. (alteration in original) (quoting Littlejohn, 795 F.3d at 320).

Plaintiff has failed to meet her pleading burden. Plaintiff principally alleges that SUNY-DMC has created a hostile work environment by "treat[ing] male telecommuters more favorably than female telecommuter[s] based on their gender." (Id. ¶ 230.) In support of this claim, Plaintiff alleges that, since February 2017, Clenman has required Plaintiff and at least two of her female coworkers to submit to electronic monitoring while telecommuting. (Id. ¶¶ 224, 228.) Plaintiff does not specify the severity or pervasiveness of the monitoring; just that male employees are allegedly not subject thereto. (Id. ¶ 225.) Based on Plaintiff's pleadings, the

court cannot conclude that this monitoring, by itself, materially altered the terms and conditions of her employment.  See Demoret v. Zegarelli, 451 F.3d 140, 150 (2d Cir. 2006).  Courts holding that excessive monitoring gives rise to a hostile-work-environment claim do so only when the monitoring is alleged in combination with other activities that "plausibly suggest the existence of an objectively hostile environment."  See, e.g., Rother v. NYS Dep't of Corrs. & Cmty. Supervision, 970 F. Supp. 2d 78, 92-93 (N.D.N.Y. 2013); Lamar v. Inst. for Family Health, No. 09-CV-1154, 2011 WL 2432925, at *11 (N.D.N.Y. June 16, 2011) ("Here, the record contains ample evidence of alleged sexually based harassment that could allow a jury to conclude that the monitoring of plaintiff's time, an otherwise sex-neutral incident, was, in fact, sex-based."); Levitant v. City of N.Y. Human Res. Admin., 625 F. Supp. 2d 85, 100-01 (E.D.N.Y. 2008) (considering "evidence of excessive monitoring . . . in determining whether the overall work environment . . . was sufficient to constitute a hostile work environment" given the plaintiff's contention that the monitoring was "part of a broader campaign of harassment and retaliation" (citations omitted)).  Plaintiff's only other allegation regarding gender-based discrimination in this context is that Sookhoo "is in the process of implementing an unlawful ban on telecommuting as an accommodation."  (Id. ¶ 232.)  Nevertheless, Plaintiff herself continues to telecommute, as do some of her other coworkers.  (See id. ¶¶ 224-36.)  With this alleged ban not having yet been put into place, Plaintiff plainly cannot show that the terms and conditions of her employment have been altered thereby, nor can Plaintiff use it to support her claim that the monitoring of her telecommuting constituted a hostile work environment.

### 2.   Disability Discrimination Claim Against SUNY-DMC

To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must allege "[1] that he or she is a person with disabilities under the Rehabilitation Act,

[2] who has been denied benefits of or excluded from participating in a federally funded program or special service, [3] solely because of his or her disability." Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 216 (2d Cir. 2012) (citation omitted); see Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 187 (2d Cir. 2015). Claims under the Rehabilitation Act are, by and large, treated the same as claims under Title II of the Americans with Disabilities Act ("ADA"). See Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). Plaintiff states that she is a disabled person within the meaning of the Rehabilitation Act because she suffers from a "chronic autoimmune disease." (SAC ¶ 2; see id. ¶¶ 22, 283.) She alleges that she suffered an adverse action by being forced to undergo a month-long delay before receiving her telecommuting accommodation. (Id. ¶ 284.) She further alleges that SUNY-DMC discriminated against her by excessively monitoring her performance, increasing her workload, demoting her, failing to promote her, lowering her performance evaluation, and subjecting her to a hostile work environment. (Pl. Opp'n to State Mot. (Dkt. 68) at 13.) The State Defendants argue that Plaintiff has not plausibly alleged that she is disabled within the meaning of the Rehabilitation Act or that she suffered an adverse employment action solely due to her disability. (State Mem. at 12-17.)

Assuming Plaintiff has pleaded that she is disabled within the meaning of the Rehabilitation Act, the court dismisses her discrimination claim under the statute because she has failed to allege any adverse employment action that occurred solely because of her disability. A Rehabilitation Act plaintiff sustains an adverse employment action if she "endures a 'materially adverse change' in the terms and conditions of employment." Kelly v. N.Y. State Office of Mental Health, 200 F. Supp. 3d 378, 396 (E.D.N.Y. 2016) (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "A materially adverse change is a change in working

conditions that is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" <u>Vale v. Great Neck Water Pollution Control Dist.</u>, 80 F. Supp. 3d 426, 434 (E.D.N.Y. 2015) (quoting <u>Galabya</u>, 202 F.3d at 640). As a preliminary matter, the court agrees with SUNY-DMC that most of Plaintiff's claimed adverse actions do not meet this definition.

Plaintiff claims that her workload was disproportionately "increased" by Clenman (SAC ¶¶ 206-10) but does not set forth facts showing how her workload was increased or what work Clenman assigned to similarly situated employees. The absence of these allegations was sufficient for the district court in <u>Delgado v. Triborough Bridge & Tunnel Authority</u>, 485 F. Supp. 2d 453 (S.D.N.Y. 2007), to find that the plaintiff had only pleaded an "ordinary alteration of job responsibilities rather than an adverse action." <u>Id.</u> at 461. The same is true here.

Similarly, while a demotion in title may ordinarily qualify as an adverse employment action, <u>see</u> <u>Sanders v. N.Y.C. Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004), Plaintiff has not plausibly pleaded that her alleged demotion was more than a mere inconvenience. As she admits, her title was not actually changed; rather, her title was simply listed incorrectly in an internal organizational chart. (SAC ¶¶ 188-90.) When informed of this fact, SUNY-DMC conceded that Plaintiff's "mislabeled" title was an error. (<u>Id.</u> ¶ 191.) Plaintiff has not pleaded that the subsequent delay in fixing the error materially altered the terms and conditions of her employment; instead, she states only that the "temporary demotion" was "materially harmful." (<u>Id.</u> ¶ 194.) This conclusory allegation cannot support an inference that she was adversely affected to the degree necessary to support an action under the Rehabilitation Act.

"To qualify as an adverse employment action, a negative performance evaluation must trigger negative consequences to the conditions of employment." <u>Trachtenberg v. Dep't of Educ.</u>, 937 F. Supp. 2d 460, 469 (S.D.N.Y. 2013) (citation and internal quotation marks

omitted); see id. (collecting cases). Here, Plaintiff alleges that she was given a negative performance review but does not allege that any consequences befell her as a result thereof. (See SAC ¶¶ 195-206, 216-23.) Without the pleading of other adverse consequences, the court cannot base its analysis of Plaintiff's disability-discrimination claim on these evaluations.

Finally, as discussed above, Plaintiff's allegations relating to excessive monitoring or the allegedly threatened ban on telecommuting do not establish that the terms and conditions of her employment were materially altered.

This leaves two employment actions: the alleged failure to promote and the alleged delay in providing Plaintiff with a telecommuting accommodation.[4] Unlike the ADA, which "covers situations in which discrimination on the basis of disability is one factor, but not the only factor, motivating an adverse employment action," Logan v. Matveeskii, 57 F. Supp. 3d 234, 254 (S.D.N.Y. 2014) (citation and quotation marks omitted), the Rehabilitation Act "requires that the alleged discrimination take place solely due to an individual's disability." Kelly v. N.Y. State Office of Mental Health, 200 F. Supp. 3d 378, 390 (E.D.N.Y. 2016) (citation omitted); see 29

---

[4] While it is arguable that the delay does not qualify as an adverse employment action, the court finds this to be a closer question than the State Defendants admit. See Delgado, 485 F. Supp. 2d at 460.

U.S.C. § 794(a).[5]  In order to show than an adverse action occurred "solely" because of the

plaintiff's disability, she must show (1) that there was a causal connection between her disability

and the adverse action and (2) that the disability was the only cause of the decision.  Nadel v.

Shinseki, 57 F. Supp. 3d 288, 298 (S.D.N.Y. 2014) (citing Sedor v. Frank, 42 F.3d 741, 746 (2d

Cir. 1994)).  "If the employer can show that its decision was motivated at least in part by a factor

other than the plaintiff's disability, the Rehabilitation Act claim must be rejected." Sedor, 42

F.3d at 746.

Plaintiff's Rehabilitation Act discrimination claim ultimately fails because she has not

alleged the requisite discriminatory intent for either remaining adverse action.  As to the failure

to promote, Plaintiff pleads that SUNY-DMC failed to promote her either "because of her

gender" or "in retaliation for filing the instant lawsuit."  (SAC ¶¶ 176-77.)  Similarly, Plaintiff

alleges that SUNY-DMC delayed in providing her with a telecommuting accommodation as

---

[5] Plaintiff argues that language from the Second Circuit stating that "the Rehabilitation Act and the ADA impose identical requirements" invalidates the Rehabilitation Act's requirement that disability discrimination be the "sole" reason for the adverse employment action. (Pl. Opp'n to State Mot. at 11-12 (quoting Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999).)  Plaintiff is incorrect. First, the text of the Rehabilitation Act, unlike the ADA, states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be . . . subjected to discrimination." 29 U.S.C. § 794(a); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 337 (2d Cir. 2000) ("The elimination of the word 'solely' from the causation provision of the ADA suggests forcefully that Congress intended the statute to reach beyond the Rehabilitation Act to cover situations in which discrimination on the basis of disability is one factor, but not the only factor, motivating an adverse employment action.").  Second, courts recognize that this textual distinction is meaningful. See, e.g., Logan, 57 F. Supp. 3d at 254 ("[T]he Rehabilitation Act is limited to denials of benefits solely by reason of disability, while the ADA applies more broadly to such denials by reason of disability." (citations and internal quotation marks omitted)); see also McElwee v. County of Orange, 700 F.3d 635, 640 (2d Cir. 2012) (stating that the standards adopted by the ADA and the Rehabilitation Act are "nearly identical" (emphasis added)).  While Plaintiff is correct that the Second Circuit has stated that "a plaintiff with disabilities suing under the ADA or Rehabilitation Act may show that he or she has been excluded from or denied the benefits of a public entity's services or programs 'by reason of such disability' even if there are other contributory causes for the exclusion or denial," Henrietta D., 331 F.3d at 291, the court only treated the statutes identically because "one of [their] subtle distinctions [was not] pertinent to [that] particular case," id. at 272.

Here, where the State Defendants claim that their alleged anti-disability animus was not the sole reason for the adverse employment actions against Plaintiff, the Rehabilitation Act's heightened causation requirement is relevant. Cf. Schine ex rel. Short v. N.Y. State Office for People with Dev. Disabilities, No. 15-CV-5870 (SJF) (SIL), 2017 WL 9485650, at *4 (E.D.N.Y. Jan. 5, 2017) ("Plaintiff does not claim that he required and/or was denied a reasonable accommodation for any reason other than his disability. Accordingly, as Plaintiff's claims do not implicate any of the 'subtle differences,' between the two statutes, they may be analyzed together." (citation omitted)), R&R adopted, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017).

"retaliation . . . for previously raising the violations of her rights." (Id. ¶ 164.) Thus, even if the court construed the SAC as alleging that SUNY-DMC took these actions because of her disability, Plaintiff also alleges that SUNY-DMC had other reasons for taking these actions—namely, discrimination on account of gender, or retaliation based on Plaintiff's gender and religion. (Cf. id. ¶¶ 105, 134.) The multitude of motivations proffered by Plaintiff for these adverse actions dooms her discrimination claim under the Rehabilitation Act.

3.    Racial and Religious Discrimination Claims Against Dooley and PMA

Plaintiff alleges that Dooley discriminated against her by withholding a promised raise in 2013 and failing to promote her to a supervisory position in 2014. (SAC ¶¶ 255-56; see id. ¶¶ 92-104, 122-27.) Plaintiff further claims that PMA is subject to respondeat superior liability for Dooley's allegedly discriminatory actions. Because the court finds that Dooley is not liable for racial or religious discrimination under § 1981, it need not ask whether PMA may be held liable for Dooley's actions.

Claims of disparate treatment under § 1981 are evaluated under the same standard as claims brought under Title VII. See Littlejohn, 795 F.3d at 312. Therefore, in order to establish claims of racial and religious discrimination under § 1981 Plaintiff must plausibly allege (1) that her employer took an adverse action against her (2) because of her race, color, religion, sex, or national origin. Vega, 801 F.3d at 85; Isbell v. City of New York, 316 F. Supp. 3d 571, 590 (S.D.N.Y. 2018). The court may infer discriminatory intent where the Plaintiff alleges circumstances including "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Littlejohn, 795 F.3d at 312 (citation and quotation marks

omitted).  At this stage in the litigation, the plaintiff "need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Vega, 801 F.3d at 86-87 (quoting Littlejohn, 795 F.3d at 311).  In establishing discriminatory motivation, the plaintiff may "rely on bits and pieces of information to support an inference of discrimination, i.e., a mosaic of intentional discrimination." Id. at 86 (citation and internal quotation marks omitted).

Plaintiff has met the first pleading requirement.  As the Second Circuit has explained, "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya, 202 F.3d at 640.  Both denial of a raise and failure to promote constitute adverse employment actions.  See Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (failure to promote); Ebanks v. Neiman Marcus Grp., Inc., 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006) (denial of a raise).  As to the failure to promote, Plaintiff alleges that she interviewed for a supervisory position and that, despite meeting the qualifications for the job, was denied the promotion in favor of an external applicant.  (SAC ¶¶ 122-23, 126.)  As to the denial of a raise, Plaintiff alleges that Dooley promised her a raise to keep her from leaving SUNY-DMC but then "intentionally stopped the processing of Plaintiff's raise." (Id. ¶¶ 94, 102.)  Plaintiff has sufficiently pleaded that both of these adverse actions occurred to her.

Plaintiff's claim falls short at the second requirement: that these adverse actions occurred "because of" Dooley's discriminatory animus.  First, as to the failure to promote, this allegation fails to raise a discriminatory inference because Plaintiff does not allege any facts about the external candidate.  Without an allegation that Dooley treated Plaintiff—or Stockhammer, who was also allegedly denied this promotion—"less favorably than a similarly situated employee

31

outside of the protected group," the court cannot find that these facts, if true, would suggest discriminatory intent on the part of Dooley.  See Raspardo v. Carlone, 770 F.3d 97, 126 (2d Cir. 2014); Dedjoe v. McCarthy, No. 15-CV-1170, 2017 WL 4326516, at *7 (N.D.N.Y. Sept. 28, 2017).

The remainder of Plaintiff's contentions concerning discriminatory intent rest on circumstantial evidence of Dooley's anti-Jewish animus, including: Dooley's referring to Clenman and Chait as "boychiks" during her raise negotiations; an alleged audit of the timesheets of Jewish employees to ensure they were not using "sick days" for religious holidays; and "a series of demotions" instituted by Dooley against his "Jewish staff," including Joel Stern, Chait, and Clenman.  (See Dooley Mem. in Supp. of Mot. to Dismiss (Dkt. 60) at 5-6; Pl. Opp'n to Dooley Mot. (Dkt. 61) at 6.)

Plaintiff's allegation that Dooley referred to Clenman and Chait as "boychiks" during her 2013 raise negotiations does not raise an inference of discriminatory intent.  "When assessing whether remarks are probative of discriminatory intent, the Second Circuit has held that '[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.'"  Sethi v. Narod, 12 F. Supp. 3d 505, 538-39 (E.D.N.Y. 2014) (alteration in original) (quoting Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007)).  In general, "a handful of isolated incidents will not rise to an actionable level."  Love v. Premier Utility Servs., LLC, 186 F. Supp. 3d 248, 254 (E.D.N.Y. 2016).  Here, the single reference—in two years—to "boychiks," despite having a temporal proximity to one of the adverse employment actions, is nothing more than a "stray remark" not probative of discriminatory intent.  Cf. Paul v. Postgraduate Ctr. for Mental Health, 97 F. Supp. 3d 141, 167-68 (E.D.N.Y. 2015) (stating that two remarks in six years is "the very

definition of what constitutes stray remarks" (internal quotation marks omitted)). Furthermore, unlike in other cases where courts have found that a single allegedly discriminatory remark is probative of discriminatory intent, the word "boychik" is not "objectively and inextricably linked to racial [or religious] animus." Cf. Love, 186 F. Supp. 3d at 255.

As for the audit, Plaintiff fails to make any specific allegations about this occurrence other than that, "on information and belief," Dooley instructed his secretary to audit the timesheets of all Jewish employees after the religious holidays. (SAC ¶ 91.) Plaintiff does not allege any facts regarding audits—or lack thereof—of the timesheets of non-Jewish employees. Plaintiff also fails to provide any information regarding when the alleged audit occurred and whether there is any nexus between this allegation and the adverse employment actions. The SAC is devoid of any required specifics as to this allegation, which cannot support an inference of discriminatory intent by Dooley.

Finally, for the same reason that Plaintiff has failed to plead that Dooley failed to promote her because of discriminatory animus, Plaintiff's claim that Dooley instituted a "series of demotions" against Jewish staff does not raise an inference of discrimination. See, e.g., Littlejohn, 795 F.3d at 312-13 ("[A]n inference of discrimination . . . arises when an employer replaces a . . . demoted employee with an individual outside the employee's protected class.").

**B.   Retaliation Claims**

"To establish a presumption of retaliation at the initial stage of . . . litigation, a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Id. at 315-16 (citation and internal quotation marks omitted); see Vega, 801 F.3d at 90 ("[T]he plaintiff must plausibly

allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) 'because' [she] has opposed any unlawful employment practice.").

What constitutes an "adverse employment action" is broader in the retaliation context than in the discrimination context.  In the context of a retaliation claim, an adverse employment action is any "materially adverse" action, i.e., an action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).  Like with discrimination claims, "'[p]etty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." Id. (quoting White, 548 U.S. at 68).  "Material adversity is to be determined objectively, based on the reactions of a reasonable employee." Tepperwien v. Entergy Nuclear Opers., Inc., 663 F.3d 556, 568 (2d Cir. 2011).  "In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." Hicks, 593 F.3d at 165 (internal quotation marks omitted); see Rodas v. Town of Farmington, 567 F. App'x 24, 28 (2d Cir. 2014) (summary order) (asking whether "identified actions . . . in the aggregate . . . affect[ed] [the plaintiff] in any materially adverse way").

As for causation, "for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90.  The plaintiff can "indirectly establish a causal connection . . . by showing that the protected activity was closely followed in time by the adverse employment action." Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.,

252 F.3d 545, 554 (2d Cir. 2001) (alteration adopted) (citation and internal quotation marks omitted). Although the Second Circuit has not fixed a time limit beyond which the adverse action will be too remote to establish causation, it has held that "five months is not too long to find the causal relationship." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).

Plaintiff brings three counts of retaliation in violation of federal law. Against SUNY-DMC, Plaintiff alleges retaliation against in violation of Title VII and the Rehabilitation Act. (SAC ¶¶ 272-79, 288-93.) Against Dooley and PMA, Plaintiff alleges retaliation in violation of § 1981. (Id. ¶¶ 259-65.)

      1.    Retaliation by SUNY-DMC

Plaintiff bases her Title VII and Rehabilitation Act retaliation claims on a series of adverse actions she alleges SUNY-DMC took against her after three separate instances of protected activity.[6] SUNY-DMC does not dispute that Plaintiff's own actions—specifically, her August 11, 2015, letter to her supervisor alleging discrimination; her October 9, 2015, filing of charges with the EEOC; and her October 6, 2016, initial complaint in this action—are "protected activities" within the meaning of Title VII and the Rehabilitation Act. See Halstead v. N.Y.C. Transit Auth., No. 99-CV-3450 (CBA), 2002 WL 34438897, at *11 (E.D.N.Y. Dec. 30, 2002) ("Although the easiest scenario to establish that a plaintiff engaged in protected activity is when he or she complains to an administrative body, protected activity also may take the form of less formal protests." (citation omitted)). Plaintiff alleges that, in response to the August 11, 2015, letter, she was "hounded" by Clenman to make positive statements about SUNY-DMC (SAC

---

[6] The court analyzes Plaintiff's Title VII and Rehabilitation Act retaliation claims together because the claims stem from identical factual allegations (see Pl. Opp'n to State Mot. at 14-17, 23) and require identical legal analysis, see Shih v. JPMorgan Chase Bank, N.A., No. 10-CV-9020 (JGK), 2013 WL 842716, at *5 (S.D.N.Y. Mar. 7, 2013) ("The anti-retaliation provisions in Title VII . . . [and] the ADA . . . contain nearly identical language and are analyzed under the same framework.").

¶¶ 137-39), excessively scrutinized and monitored (id. ¶¶ 143-45), and investigated for her use of sick days (id. ¶ 146). (See Pl. Opp'n to State Mot. at 15.) She alleges that, in response to the October 9, 2015, EEOC charge, SUNY-DMC demanded that she receive a negatively revised evaluation (SAC ¶¶ 154-57) and delayed in granting her a telecommuting accommodation or an extension of her FMLA leave (id. ¶¶ 160-63). (Pl. Opp'n to State Mot. at 15-16.) She finally alleges that, in response to the filing of this lawsuit, SUNY-DMC failed to promote her (SAC ¶ 177), installed a supervisor with "demonstrated retaliatory animus against Plaintiff" (id. ¶ 181), conducted an audit of Plaintiff's timesheets (id. ¶ 182), temporarily demoted Plaintiff's title (id. ¶¶ 188-193), gave Plaintiff unwarranted negative performance reviews (id. ¶¶ 196, 216-18), falsely denigrated Plaintiff's performance (id. ¶¶ 195, 197-99), increased Plaintiff's workload (id. ¶ 210), and subjected her to additional monitoring (id. ¶¶ 224, 238). (Pl. Opp'n to State Mot. at 16-17.) The State Defendants' motion to dismiss turns on two questions: whether Plaintiff's complaint plausibly supports an inference that SUNY-DMC's alleged actions are adverse employment actions, and whether Plaintiff has pleaded sufficient factual matter to plausibly support a causal connection between SUNY-DMC's actions and her protected activities. (State Mem. at 18-22.)

> a.    *Adverse Employment Actions*

Many of Plaintiff's retaliation allegations have been discussed above in the context of her discrimination claims. Nevertheless, because the definition of "materially adverse" in the context of discrimination is different from its definition in the context of retaliation, the court must once again analyze these alleged adverse employment actions.

Plaintiff's allegations of excessive monitoring and scrutiny of her timesheets, including that SUNY-DMC conducted a search of her work computer, are not adverse employment

actions. See Fahrenkrug v. Verizon Servs. Corp., 652 F. App'x 54, 57 (2d Cir. 2016) (summary order). Nor was Clenman's "hounding" of her to make positive statements about SUNY-DMC anything more than a "minor annoyance." See Tepperwien, 663 F.3d at 571 (construing verbal threats that were never acted on as "trivial harms"). Similarly, the alleged audit of Plaintiff's timesheets does not constitute an adverse employment action because, while Plaintiff felt that "that the slightest innocent discrepancy could be cause for discipline," there is no allegation that these audits resulted in Plaintiff being disciplined. (SAC ¶ 182.) Plaintiff has also not pleaded facts that would show that her alleged increased workload or the alleged delay in processing her FMLA extension or accommodation request effected a material change in her working conditions. See Mutts v. S. Conn. State Univ., 242 F. App'x 725, 727 (2d Cir. 2007) (summary order); Graham v. Macy's, Inc., No. 14-CV-3192 (PAE), 2016 WL 354897, at *10 (S.D.N.Y. Jan. 28, 2016). Finally, as discussed above, Plaintiff's allegation that her title was temporarily demoted was not more than a mere inconvenience and thus it cannot support a retaliation claim.

Additionally, Plaintiff's allegation of failure to promote also does not constitute an adverse employment action for retaliation purposes. While it is easy to see how the denial of a promotion could "dissuade a reasonable worker from making or supporting a charge of discrimination," such a conclusion only attaches if the employee makes a showing that she was qualified for the position. See Hinton v. City College of N.Y., No. 05-CV-8591 (GEL), 2008 WL 591802, at *25 (S.D.N.Y. Feb. 29, 2008); see also Byrne v. Telesector Res. Grp., Inc., No. 04-CV-76, 2007 WL 962929, at *10 (W.D.N.Y. Mar. 29, 2007) (finding that a delayed promotion can constitute an adverse action for retaliation). Because, as discussed above, Plaintiff has not made such a showing, her failure-to-promote allegation may not form the basis of her retaliation claim.

As the Second Circuit has recognized, a written letter of reprimand placed in an employee's file "is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy." Millea v. Metro-North R.R. Co., 658 F.3d 154, 165 (2d Cir. 2011). Accordingly, the alleged negative revision of Plaintiff's 2016 performance review (SAC ¶¶ 196, 216-18), and the reprimands written by Clenman to Plaintiff with senior management copied (id. ¶ 195) both constitute materially adverse employment actions for retaliation purposes. The allegation that SUNY-DMC's employees pressured Lambkin to give Plaintiff a negative review in January 2016 does not, however, state an adverse employment action because there is no allegation that any harm came to Plaintiff as a result of this pressure. (See id. ¶¶ 154-55.)

The alleged installation of Clenman as Plaintiff's supervisor also constitutes an adverse employment action. Plaintiff alleges that Clenman was installed as her supervisor in December 2016 (id. ¶ 179) and that, subsequent to that time, Clenman engaged in additional adverse actions against her, including the revision of her positive performance review (see id. ¶¶ 216-21). Therefore, for the same reasons that Plaintiff's revised review constitutes an adverse employment action, so too does the change in supervisor. See also Taylor v. City of New York, 207 F. Supp. 3d 293, 307-08 (S.D.N.Y. 2016) (requiring a plaintiff alleging retaliatory transfer to provide information as to how the transfer affected her).

> b.   *Causation*

In order to state a claim for retaliation, Plaintiff must show that the alleged adverse employment actions were causally connected to her protected activities. As stated above, where the plaintiff does not have direct evidence of causation, "[c]lose temporal proximity" may

suffice.  See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010).  "[D]istrict courts

within the Second Circuit have consistently held that the passage of two to three months between

the protected activity and the adverse employment action does not allow for an inference of

causation."  Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007);

see Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are

routinely dismissed when as few as three months elapse between the protected EEO activity and

the alleged act of retaliation.").  Nevertheless, "it is the role of the court to 'exercise its judgment

about the permissible inferences that can be drawn from temporal proximity in the context of

particular cases.'"  Redd v. N.Y. State Div. of Parole, 923 F. Supp. 2d 371, 388 (E.D.N.Y. 2012)

(quoting Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)).

Plaintiff's remaining adverse employment actions all occurred more than two months

after she filed the complaint in this case on October 9, 2016:  The installation of Clenman as

Plaintiff's supervisor occurred in late December 2016 (SAC ¶ 179); Clenman's issuance of

disciplinary reprimands occurred on or about January 10, 2017 (id. ¶ 195); and Plaintiff was

informed that she would be receiving a new performance review that same day, though she

eventually received it on or about February 13, 2017 (id. ¶¶ 196, 216).

The State Defendants first argue that the period of time between the filing of the

complaint on October 9, 2016, and any of these actions is too long to show causation.  (State

Mem. at 21.)  The court disagrees.  While two months may ordinarily be an appropriate (if

somewhat arbitrary) cutoff for determining "close temporal proximity," the court does not

believe it would be prudent to apply that limit in this case.  Standing alone, one of the adverse

actions alleged by Plaintiff, having occurred over two months after the protected activity, might

not be able to receive the presumption of causation through temporal proximity.  Given,

39

however, that the question of temporal proximity must be analyzed "in the context of particular cases," Espinal, 558 F.3d at 129, the court believes that a causal inference is appropriate here. There are three alleged adverse actions, all of which occurred in close proximity to each other, and all of which occurred no more than four-and-a-half months after the filing of the complaint in this case. Cf. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 ("[F]ive months is not too long to find the causal relationship."). The court finds that the temporal relationship between the filing of the federal-court complaint and these three actions is not too attenuated to establish causation.

The State Defendants additionally argue that temporal proximity should be measured from either Plaintiff's August 11, 2015, letter, or her October 9, 2015, filing of charges with the EEOC. (State Mem. at 21.) This is so, they claim, because "the temporal connection should be measured from the earliest alleged protected activity complaining about discrimination." (Id.) In making this argument, the State Defendants misread this court's decision in Redd. In Redd, the court held that not every litigation activity undertaken by a plaintiff subsequent to filing a complaint in federal court "can constitute a separate 'protected activity'" for the purposes of determining causation. 923 F. Supp. 2d at 389. "[I]f that were true, just about any adverse employment action taken during a lengthy discrimination case could be considered the result of retaliatory animus." Id. But the concerns motivating the court's decision in that case are not present here. Plaintiff's protected activities were not separate activities stemming out of one litigation; they were separate complaints registered at increasingly senior levels. Accordingly, the court is able to measure temporal proximity from the time each separate complaint was filed. The State Defendants' preferred rule would make little sense: Consider an employee who, faced with discrimination at work, emails her supervisor to complain. The employee has made a

complaint, yes, but the full range of decision-makers at the employer are not necessarily aware of it, and an internal complaint is much less serious than a complaint to a federal agency or court. So the employee endures the same invidious discrimination for two more years, with nothing having been resolved and no retaliation having been taken against her for her initial email. Fed up, the employee finally files a charge with the EEOC. Suddenly her entire employer—from the CEO down to her supervisor—is actually aware of her complaint. And suddenly the employer realizes it may be facing significant legal liability, especially after either the employee or the EEOC is able to file a complaint in federal court. Instead of remedying the increasingly grave situation, however, the employer docks the employee's pay, demotes her, and gives her twice as much work as anybody else in her division, hoping to induce her to withdraw her claim. Does the two year gap between Plaintiff's first complaint to her supervisor and the eventual adverse employment actions preclude the consideration of these instances of retaliation? The court thinks not. Where a new complaint is made to a more senior decision-maker or more advanced legal body, the court may restart the clock for causation purposes.

2.    Retaliation by Dooley and PMA

Plaintiff brings claims for retaliation against Dooley and PMA on the basis of two alleged incidents: first, Plaintiff alleges that, in response to her January 24, 2014, complaint about discrimination by Dooley, which she sent to Leonzo Cuiman in SUNY-DMC's Department of Labor Relations, Dooley undertook "a sham investigation, tainting Plaintiff[']s file and cutting off Plaintiff[']s opportunity for employment with a third party" (SAC ¶ 260); and second, Plaintiff alleges that, in response to her August 11, 2015, complaint about discrimination by Dooley, which she sent to SUNY-DMC's General Counsel, Dooley "subject[ed] her to over

41

supervision, over monitoring, and rejection and further scrutiny of her sick leave records (id. ¶ 261).

"Although the statute is silent on the issue, workplace retaliation is actionable under § 1981." Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 226 (E.D.N.Y. 2018) (citing CBOCS W., Inc. v. Humphries, 553 U.S. 442, 451 (2008)). "As with discrimination claims, retaliation claims alleged under § 1981 are subject to the same analysis as those alleged under Title VII." Id. Although the plaintiff must ordinarily plead that the defendant had knowledge of the protected activity, the plaintiff can also meet this requirement by showing "that the decision-maker was at least influenced or encouraged to take the adverse action by a superior with knowledge of the protected activity." Seivright v. Montefiore Med. Ctr., No. 11-CV-8934 (AJN), 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014).

Plaintiff's retaliation claim against Dooley fails because she does not provide any information regarding his knowledge of the protected activity. She sent both of her complaints to other actors at SUNY-DMC, not Dooley. (See SAC ¶¶ 105, 136.) She claims that her retaliation against him is nonetheless proper because, on "information and belief," both of these complaints were shared with Dooley. (See id. ¶ 106 (stating that, on "information and belief," the "substance" of Plaintiff's January 24, 2014, complaint was shared with Dooley "and or" Chait); id. ¶ 136 (stating that, on "information and belief," Plaintiff's August 14, 2015, complaint was "opened in the IT department").) "While a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 316 F. Supp. 3d 635, 645 (S.D.N.Y. 2018) (citations and internal quotation marks omitted). Plaintiff offers no

facts to support her belief that Dooley had knowledge of either complaint, neither of which was sent to him or his department. Plaintiff cannot be expected at this stage to offer concrete proof of Dooley's knowledge, but she must also do more than make bare allegations devoid of any underlying basis for her belief that he had such knowledge. See Barbarito v. McHugh, No. 11-CV-179, 2013 WL 2120402, at *7 (N.D.N.Y. May 15, 2013) (stating that a contention that a defendant knew of the plaintiff's protected activity on "information and belief" "cannot establish knowledge on the part of" the defendant). In response, Plaintiff argues that she need not show that Dooley himself had knowledge of her activity, but rather that "general knowledge by the employer as an entity is sufficient." (Pl. Opp'n to Dooley Mot. at 8 (emphases omitted).) Plaintiff is correct that "general corporate knowledge" may suffice to show knowledge where retaliation is claimed against a corporate defendant. See Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013) (holding that a complaint made to a corporate officer is "sufficient to impute to [the corporate defendant] general corporate knowledge of the plaintiff's protected activity"). Here, however, Plaintiff's claims of retaliation under § 1981 are made against Dooley—an individual defendant. Without information plausibly suggesting that Dooley himself was aware of the January 24, 2014, or August 11, 2015, complaints, Plaintiff's retaliation action against him cannot lie. See Littlejohn, 795 F.3d at 315-16 (requiring a plaintiff to show "that the defendant knew of the protected activity" (emphasis added)). (See Dooley Reply (Dkt. 62) at 7-8.)

C.    **Claims Against Nath, Sookhoo, and Clenman**

Plaintiff asserts separate claims of gender and disability discrimination and retaliation under the NYSHRL and NYCHRL against Nath, Sookhoo, and Clenman. (SAC ¶¶ 294-304.)

43

The State Defendants argue that the Eleventh Amendment bars Plaintiff's suit against these defendants in either their official capacities or individual capacities. (State Mem. at 23-24.)

The Eleventh Amendment provides, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The reach of the Eleventh Amendment has been interpreted to extend beyond the terms of its text to bar suits in federal courts against states, by their own citizens or by foreign sovereigns." State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 95 (2d Cir. 2007) (alterations adopted) (citation and quotation marks omitted). "Eleventh Amendment immunity extends to state agents and state instrumentalities that are, effectively, arms of a state." Gorton v. Gettel, 554 F.3d 60, 62 (2d Cir. 2009) (citation and internal quotation marks omitted).

Because the State of New York has not consented to suit in federal court under either the NYSHRL or NYCHRL and "because SUNY (including its subdivisions) and its officials are entitled to the protection of sovereign immunity," Plaintiff cannot bring claims for money damages against Nath, Sookhoo, and Clenman in their official capacities. See Ideyi v. State Univ. of N.Y. Downstate Med. Ctr., No. 09-CV-1490 (ENV), 2010 WL 3938411, at *4 (E.D.N.Y. Sept. 30, 2010); see also Baez v. New York, 629 F. App'x 116, 118 (2d Cir. 2015) (summary order) ("New York State has not consented to be sued in federal court under the NYSHRL."); Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) ("[W]e have found no evidence that the State has consented to suit in federal court under the NYCHRL.").

Nevertheless, Plaintiff contends that she may pursue her claims under the NYSHRL and NYCHRL against Nath, Sookhoo, and Clenman in their individual capacities. (Pl. Opp'n to State Mot. at 24.) A "supervisor" may be sued in his individual capacity under Section 296(1) of

44

the NYSHRL "if he is shown either to have an ownership interest or the 'power to do more than carry out personnel decisions made by others.'"[7] Gentile v. Town of Huntington, 288 F. Supp. 2d 316, 321 (E.D.N.Y. 2003) (quoting Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003)); see Tomka, 66 F.3d at 1317. Courts generally determine that an individual may "do more than carry out personnel decisions made by others" if he has "the authority to hire and fire employees." See EEOC v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014) (citation and quotation marks omitted). "Since the NYSHRL 'uses virtually identical language' to the applicable NYCHRL provision, 'claims under both statutes are subject to the same analysis.'" Hughes v. Twenty-First Century Fox, Inc., 304 F. Supp. 3d 429, 450-51 (S.D.N.Y. 2018) (quoting Emmons v. City Univ. of N.Y., 715 F. Supp. 2d 394, 421 (E.D.N.Y. 2010)).

Although Plaintiff states that she "has previously alleged facts sufficient to show [that Nath, Sookhoo, and Clenman] can be liable in their individual capacities . . . as supervisors," she does not elaborate on this statement. (Pl. Opp'n to State Mot. at 24.) In fact, Plaintiff's pleadings and briefing do not establish that any of these defendants has the independent ability to make hiring or firing decisions. Accordingly, the court dismisses Plaintiff's NYSHRL and NYCHRL discrimination and retaliation claims against Nath, Sookhoo, and Clenman with prejudice.

### D.    Supplemental Jurisdiction

Where a court dismisses "all claims over which it has original jurisdiction," it may, in its discretion, decline to exercise supplemental jurisdiction over remaining claims in a common nucleus of operative fact with that claim. See 28 U.S.C. § 1367(c)(3); United Mine Workers of

---

[7] An individual may also be sued in his individual capacity under the NYSHRL as an aider and abettor. N.Y. Exec. Law § 296(6). Plaintiff does not allege this theory of liability. (Pl. Opp'n to State Mot. at 25.)

Am. v. Gibbs, 383 U.S. 715, 725 (1966). Courts generally decline to exercise supplemental

jurisdiction over state claims if all federal claims have been dismissed prior to trial. See N.Y.

Mercantile Exch., Inc. v. Intercontinental Exchange, Inc., 497 F.3d 109, 118-19 (2d Cir. 2007).

The Supreme Court has stated that the determination of whether to exercise such jurisdiction

should be guided by considerations of judicial economy, convenience, fairness, and comity.

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).

   Plaintiff asserts claims of racial and religious discrimination and retaliation under the

NYSHRL and NYCHRL, as well as a claim for fraudulent inducement, against Dooley and

PMA. While the court has not dismissed all federal claims in this case, it has dismissed all

federal claims against Dooley and PMA. All of the events upon which basis Plaintiff has stated a

claim to relief occurred in late 2016 and early 2017, over a year after Dooley's employment at

SUNY-DMC came to an end. Accordingly, because the claims against Dooley and PMA do not

"stem from approximately the same set of events and under similar legal standards" as those

against the State Defendants, dismissal of the remaining claims against Dooley and PMA may be

proper. See Chen v. Oceanica Chinese Rest., Inc., No. 13-CV-4623 (NGG), 2018 WL 3973004,

at *3 (E.D.N.Y. Aug. 20, 2018).

   The Cohill factors additionally weigh in favor of declining supplemental jurisdiction over

the remaining claims against Dooley and PMA. "First, this case is still in its early stages: no

discovery has taken place and no date for trial has been set." Gomez v. City of New York,

No. 12-CV-6409 (RJS), 2014 WL 4058700, at *7 (S.D.N.Y. Aug. 14, 2014). Additionally,

analysis of Plaintiff's fraudulent inducement claim turns on a somewhat complicated issue of

state law: whether an employee who claims that her employer breached a contract that he never

intended to honor may present that claim as an action sounding in fraud. See Cougar Audio, Inc.

v. Reich, No. 99-CV-4498 (LBS), 2000 WL 420546, at \*6 n.4 (S.D.N.Y. Apr. 18, 2000) (collecting "a very long and very puzzling line of New York cases"); see also Rehman v. State Univ. of N.Y. at Stony Brook, 596 F. Supp. 2d 643, 659-60 (E.D.N.Y. 2009) (citing Smalley v. Dreyfus Corp., 882 N.E.2d 882, 883-84 (N.Y. 2008)). "In light of the early stage of this case and the likelihood that at least some of Plaintiff's state claims involve unsettled issues of state law, the [c]ourt declines to exercise supplemental jurisdiction." Gomez, 2014 WL 4058700, at \*7. The court dismisses Plaintiff's state claims against Dooley and PMA without prejudice.

## IV.   CONCLUSION

For the foregoing reasons, the State Defendants' Motion to Dismiss (Dkt. 65) is GRANTED IN PART and DENIED IN PART, Defendant Dooley's Motion to Dismiss (Dkt. 59) is GRANTED, and Defendant PMA's Motion to Dismiss (Dkt. 63) is GRANTED.  All of Plaintiff's claims against Dooley and PMA are DISMISSED WITHOUT PREJUDICE. Plaintiff's claims against SUNY-DMC are DISMISSED WITHOUT PREJUDICE, with the exception of her Title VII and Rehabilitation Act retaliation claims as set forth above.  Plaintiff's claims against Nath, Sookhoo, and Clenman are DISMISSED WITH PREJUDICE.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       September 30 , 2018

NICHOLAS G. GARAUFIS
United States District Judge