**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------------x

GOLDY STERN on her own behalf

                        Plaintiff,

    -against-

STATE UNIVERSITY OF NEW YORK,
                      Defendant.
--------------------------------------------------------------------------------x

**Case No.** 16-cv-5588
(NGG)(LB)

**PROPOSED THIRD**
**AMENDED COMPLAINT**

**DEMAND FOR TRIAL BY**

Plaintiff GOLDY STERN (hereinafter "Plaintiff") by and through the undersigned counsel Mirer Mazzocchi Schalet Julien & Chickedantz PLLC, and for her Proposed Third Amended Complaint against Defendant STATE UNIVERSITY OF NEW YORK, (hereinafter "SUNY-DMC"), plaintiff states: (a) this proposed Amended Complaint is based on the decision of the Court on September 20, 2018 granting in part and denying in part Defendant SUNY-DMC's motion to dismiss and (b) granting plaintiff's letter motion for a pre-hearing conference requesting the opportunity to re-plead certain claims which were dismissed without prejudice. This case alleges gender discrimination as well as retaliation for plaintiff's exercise of her rights under Title VII of the Civil Rights Act of 1964 and retaliation for seeking an accommodation under the Rehabilitation Act.

## JURISDICTION AND VENUE

1.        Plaintiff's claims arise in part under Title VII of the Civil Rights Act 42 U.S.C. §2000(e), and 29 U.S.C. § 794. This Court has jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§1331 and 1337.

2.        Plaintiff filed timely charges of race, ethnicity, sex and religious discrimination, and retaliation under Title VII of the Civil Rights Act, 42 USC §2000e *et. seq.,* with the Equal

Employment Opportunity Commission on October 9, 2015 and received a Notice of Right to Sue dated July 8, 2016**.** This case was timely filed within ninety (90) days' of Plaintiff's receipt of the Right to Sue Letter.  She thereafter supplemented her complaint to the EEOC complaining of ongoing retaliation and specific instances for further discrimination. She timely filed her Second Amended Complaint on April 30, 2018.

## PARTIES

### PLAINTIFF

3.      Plaintiff GOLDY STERN ("Plaintiff") is an Orthodox Jewish woman. Plaintiff has been employed at SUNY-DMC as a computer programmer since May 1, 2008 and currently holds the title of SL4 Sr. Programmer/Analyst in SUNY-DMC's IT department.

### DEFENDANT

4.      SUNY-DMC is a not-for-profit medical corporation and an entity of the State of New York located at 450 Clarkson Ave, Brooklyn, NY 11203. Upon information and belief, SUNY-DMC maintains a staff of approximately eight thousand (8000) employees.

5.      SUNY-DMC is a recipient of federal funds, a condition of which is waiver of sovereign immunity with respect to the Rehabilitation Act, which incorporates elements of the Americans with Disabilities Act.

## FACTUAL ALLEGATIONS

**Background Facts**

**Plaintiff's Efforts to Obtain a Raise: the Allscripts Offer**

6.  During Plaintiff's employment at SUNY prior to the instances giving rise to this complaint, Plaintiff had always garnered praise from both supervisors and clients for her excellent work product and results.

7. Plaintiff contributed to the organization in a manner that was recognized as especially valuable, though her salary did not reflect this fact. For example, during a layoff in 2013, she was retained as an essential worker. That is, SUNY-DMC obtained a special dispensation from the union to retain her as an essential worker despite her seniority not allowing her to be retained.

8. The facts of this case have their origin in actions of John Dooley, the former Chief Information Officer and Director of IT (CIO) in failing to implement a promised raise.

9. That is, during her employment and prior to August 2013, Plaintiff had repeatedly asked SUNY-DMC for a raise without success.

10. In August 2013 Plaintiff was offered a job with Allscripts Inc. (a company which SUNY-DMC does business) for $120,000 per year. At that time Plaintiff was making approximately $80,000 per year.

11. When Plaintiff gave her notice that she was leaving, SUNY-DMC for Allscripts, SUNY-DMC through CIO Dooley agreed to increase her salary to at least $105,000—still lower than many of her male colleagues—if she agreed to turn down the Allscripts offer.

12. Plaintiff agreed to turn down the Allscripts offer in return for this raise.

13. Once the threat of Plaintiff's leaving SUNY-DMC was gone Dooley refused to pay her the agreed upon raise.

14. Even though Dooley told her the raise was still in process, Plaintiff later discovered Dooley never had any intention of processing the papers she had previously seen requesting the raise.

**Plaintiff files an Internal Discrimination Complaint and suffers retaliation**

15. On or about January 24, 2014, after having received no raise and no further updates about the processing of her raise documents, Plaintiff complained about gender and religious discrimination in an email sent to Leonzo Cuiman in Labor Relations setting forth the above

facts known to her at the time. She also stated her belief that the promised raise was quashed by Dooley for discriminatory reasons and described herself as a "young Orthodox Jewish woman being discriminated against." The complaint cited to facts that plaintiff was handling the largest workload yet getting the lowest pay, with the only other person paid as low being another Orthodox Jewish woman.

16. Based on Plaintiff's experience at SUNY-DMC both before and after this complaint was filed, it is the practice of Labor Relations to share information/complaints they receive from employees with the employee's supervisors.

17. Once she raised that spectre of a discrimination complaint, she began experiencing a series of negative actions from Dooley and her then supervisor Mr. Chait.

18. Although Plaintiff never received any acknowledgement of her January 24, 2014 complaint from Labor Relations personnel, within days of sending this email, the Labor Relations department opened an investigation into Plaintiff for alleged insubordination.

19. That is, on February 7, 2014, approximately two (2) weeks after making her complaint, Plaintiff was interrogated by Labor Relations on the "insubordination" claims and threatened with discipline for raising her desire to discuss the substance of her discrimination complaint with her supervisor.

20. Although the interrogation did not lead to any formal discipline, over the course of the next three months SUNY-DMC and Dooley continued a pattern of excessive monitoring and scrutiny of only Plaintiff's time and attendance records.

21. On or about May 6, 2014, the same day as the insubordination investigation was closed, Mr. Chait, again with a blind copy to Dooley, requested a counseling memorandum to be placed in Plaintiff's performance file, to taint her exemplary file.

22. This retaliatory treatment so distressed Plaintiff that in or about late April or early May 2014, she again sought employment with Allscripts.

23. When she spoke to the representative at Allscripts with whom she had previously dealt with, she learned that someone from SUNY-DMC had called the person who had offered Plaintiff the job and admonished him and his company not to offer Plaintiff employment in the future.

**Plaintiff is Denied A Promotion**

24. On or about July 1, 2014, plaintiff interviewed for a supervisory position, after applying and meeting the requisite qualifications.

25. Plaintiff was denied the job, being told she lacked "diversified technical skills."

26. Not only was Plaintiff passed over but also another Orthodox Jewish female colleague of Plaintiff, Riva Stockhammer, applied, was qualified and interviewed for the position and was passed over. Ms. Stockhammer was told she lacked "clinical" experience.

27. As with all positions covered by SUNY-DMC's union contract, the positions for which Plaintiff and Ms. Stockhammer applied gave preference to internal applicants, opening up applications to outside candidates only after an internal candidate search had failed.

28. Despite the fact that Plaintiff, an internal applicant, was qualified for the job, SUNY hired an outside non-Jewish female candidate whose skill sets were neither clinical nor technical, but who appeared to have some background in finance was hired in April 2015 over Plaintiff and Stockhammer, qualified internal candidates rendering SUNY-DMC's reasons for the rejection of qualified Jewish women internal applicants pretextual.

**Ongoing Harassments leading to further complaints**

29. In December 2014 Plaintiff gave birth and took maternity and FMLA leave until May 2015.

30. During her maternity leave she was repeatedly asked for additional documents to confirm the

birth of her child. Plaintiff believes these inquiries were part of the ongoing campaign of retaliatory harassment she began suffering from the time of her lodging the discrimination complaint in January 2014.

31. In March 2015 Plaintiff filed a grievance stating that the requests amounted to retaliation or pregnancy discrimination.

32. In May and June 2015 the requests for further medical documentation regarding Plaintiff's leave continued even as Plaintiff duly complied with the requests.

33. When Plaintiff returned in May 2015 Plaintiff continued to be subjected to additional monitoring.

34. On August 11, 2015 Plaintiff, through her lawyer, sent a letter to SUNY-DMC advising them of the discrimination and retaliation claims Plaintiff was making and requesting that they be stopped.

35. In error, Plaintiff's letter was not addressed to SUNY-DMC's General Counsel, but instead to her former supervisor Alan Dzija. Upon information and belief the letter made its way to SUNY-DMC's General Counsel only after being opened in the IT department.

**Plaintiff Experiences Further Retaliation after the Attorney's Letter**

36. On August 14, 2015, three days after the letter was sent, plaintiff was confronted by Stuart Clenman who was not a programmer but worked with Plaintiff, in a manner that made her very uncomfortable. That is, he tried to get her to talk privately with him behind closed doors and to make a statement that she was having no problems at SUNY-DMC which she believed he was trying to record.

37. Plaintiff refused to have this closed door meeting or to deviate from work-related issues.

38. On August 21, 2015 SUNY by its general counsel responded to Plaintiff's letter denying the existence of discrimination and denigrating Plaintiff's qualifications.

39. On August 26, 2015 Plaintiff arrived at work to find that a search performed on her computer was left open on her screen.

40. Upon information and belief, Defendants had searched her cache of search engine queries.

41. Plaintiff believed that she was being targeted for additional monitoring because of the August 11, 2015 attorney's letter and that SUNY-DMC's actions were meant to dissuade or chill her from pursuing her rights.

42. On September 10, 2015 Defendants requested further documentation to substantiate Plaintiff's use of leave days when she took her children to the doctor. That is, Labor Relations wrote to her doctor to determine if her child's conditions were such that Plaintiff needed to take the full day off.

43. Plaintiff thereafter filed a grievance with her union grieving the harassment and retaliatory treatment.

44. In a letter dated September 11, 2015, Plaintiff's attorney responded to SUNY-DMC's letter of August 21, 2015, raising, *inter alia*, the aforementioned three incidents of retaliation.

**October 9, 2015 EEOC complaint**

45.  In response to the ongoing harassment and denial of promotion, on October 9, 2015 Plaintiff filed a charge with the Equal Employment Opportunity Commission.

46. In November 2015 Dooley resigned and was replaced by his former deputy Dilip Nath.

47. In or about early January 2016 Plaintiff was approached by her then supervisor Susann Lambkin.  Ms. Lambkin, who had received the promotion Plaintiff had previously applied for, gave Plaintiff a copy of a positive performance review she had done of Plaintiff and informed

her that Nath had told her that the review of Plaintiff was too positive and had instructed Ms. Lambkin to submit a revised negative evaluation.

48.  Ms. Lambkin informed Plaintiff that she stood by her evaluation of Plaintiff as an outstanding employee and provided her with a copy of the review in the event that Nath had the review redone by another supervisor as he had threatened to do.

49. On February 3, 2016 SUNY submitted its Response to Plaintiff's EEOC charge, in which its defense consisted in part of denying Plaintiff's excellent employment record.

**Plaintiff is diagnosed with An Illness Which Requires an Accommodation**

50.  On February 23, 2016 Plaintiff took FMLA leave after being diagnosed with a serious illness.

51.  After six weeks, and as her FMLA leave was running out, Plaintiff sought to return to work with an accommodation of telecommuting.

52.  Even though Plaintiff provided the requisite documentation to the Human Resources on April 3, 2016 requesting the accommodation, she did not receive a response until April 26, when she was told that she was not entitled to any timeline for a response to her request.

53. On April 27, Plaintiff requested an extension of her FMLA to ensure no gap between the end of her leave and her being granted the accommodation, without which she could be terminated. SUNY-DMC however denied the FMLA extension and informed Plaintiff that she must return to work.

54.  Plaintiff was panicked that SUNY-DMC was attempting to constructively discharge her, or force her to abandon her job by not deciding the accommodation request until after her FMLA leave had run out.

55.  Only after Plaintiff's attorney sent an attorney's letter to counsel for SUNY-DMC on May 9, 2016 was the accommodation request reviewed.  The accommodation of telecommuting was

made based on Plaintiff's attorney's intervention. Plaintiff's chronic condition can be exacerbated by stress. The failure of SUNY-DMC to respond to her request for an accommodation in a timely manner, requiring intervention by counsel, only exacerbated Plaintiff's condition.

**Plaintiff is denied another promotion to a Project Manager Position**

56. On or about June 6, 2016 Plaintiff applied for Project Manager Position at SUNY-DMC in the Revenue Cycle Group, which is a higher paying position than Plaintiff presently holds.

57. The Original Complaint in this case was filed in this Court on October 6, 2016.

58. Between Plaintiff's application for the Project Manager Position and the filing of the original complaint, Plaintiff was not interviewed despite being qualified.

59. Shortly after SUNY-DMC was served with the complaint, on November 6, 2016 Plaintiff was informed she would be interviewed for the Project Manager position.

60. Plaintiff sets forth below the Job Description and Qualifications for the Project Manager Position and why she met these qualifications both in terms of experience and education. Plaintiff divides the job description into its various components and after each one states in bold how she met the qualifications.  She will then describe why she was more qualified than the successful applicant, Stuart Clenman.

61. The Project Manager is responsible for managing multifaceted IT projects ensuring scope is delivered according to deadlines, budget, and quality standards.  The Revenue Cycle Project Manager will manage enterprise wide strategic projects with complex scope and scale and may report progress or matrix report on a project directly to Senior Leadership. **Plaintiff had experience with these aspects of the Project Manager Job because during the Allscripts migration, she was the lead person for all aspects of the project – testing, documenting,**

**and reporting.**

62.  The Project Manager Develops the project plan, builds schedules, manages project meetings, communicates progress and status, enforces quality management, identifies responds, manages risks and changes, manages all Revenue Cycle Information Technology project activities and ensures all project phases are documented appropriately. **Plaintiff had experience with these aspects of the Project Manager Job Description as she has significant experience working on the dunning tables, in which she created a spread-sheet to maintain modifications so rollback and analysis would be easy to perform.**

63.  Additionally, the Revenue Cycle Systems Project Manager will serve as a mentor for Revenue Cycle Analysts. **Plaintiff, while working on the sequel conversion project, mentored the others in the group on the techniques used to convert the files. She happily shared her knowledge.**

64.  Other duties/responsibilities include the following: Provide expertise and leadership skills to direct a project team and ensure project and organization's goals, philosophies and objectives are optimally supported by information technology. **While working on various projects (LICH migration, Allscripts interface, SQL conversion) Plaintiff was always an active participant in meetings and provided her expertise to ensure the projects were optimally supported.**

65.  Create and execute Project plans and revises appropriately to meet changing requirements and needs. **In all projects Plaintiff was involved in, she was always adaptable to the changing scope of the project.**

66.  Plan and schedule Project timelines and milestones using the appropriate tools. Manage day-to-day operational and tactical activities of a projects and operational needs. **Plaintiff has**

**always used the tools relevant to the project she was working on. Plaintiff has demonstrated a hands on approach to all projects that she is involved in. She has performed day to day operational activities and is aware of the steps necessary to supervise that they are performed.**

67. Develop and deliver Progress Reports, Proposals, Requirements Documentation and Presentations. **Plaintiff has been heavily trained on progress reports over the years at Downstate and has developed and delivered them consistently over the years.**

68. Diagnose task/procedural change issues and helps to resolve the problem. **Before making modifications, Plaintiff always analyzed first and documented changes so the quick fix did not create problems for other areas of the programs.**

69. Ensure that Project documents are current and complete, as well as, appropriately managed and stored. **Plaintiff implemented and maintained documentation on all aspects of her duties as required.**

70. Assure that Project legal documents are completed and signed. **When changing service providers for remittances, Plaintiff was responsible for filling out the documents and having it signed by the appropriate business department staff.**

71. Conduct Project post mortems and creates Lessons Learned reports to identify Project elements that were both successful and unsuccessful. **Plaintiff is strongly proficient in following policies and procedures and documentation.**

72. Evaluate the content of Status Reports and frequency of delivery; analyzes results of the Progress Reports and troubleshoot problem areas. **Plaintiff has worked closely with the business office to create reports that keep managers abreast of progress in problem areas.**

73. Defines Project success criteria, communicating that throughout the Project team review deliverables prepared by the project team. **Plaintiff is a team player and keeps team members informed of project progress.**

74. Communicate relevant project information to superiors and the stake holders. Plaintiff always had an open line of communication with her stake holders and responded to their inquiries in a timely manner. She keeps all informed of progress and issues encountered.

75. Proactively manage changes in Project scope, identifies any potential crises or issues and devises contingency plans to mitigate concerns. **Plaintiff's approach which has been very successful is to analyze the problem first, rather than jump in first which has caused other problems.**

76. Effectively apply the company's Project Management and Software development Lifecycles methodology and enforces Project standards. **Plaintiff has always used the software provided by Downstate while working on various projects (footprints, change control.)**

77. Minimize exposure and risk on a Project. Ensure timely completion of Project level tasks. Identify resources needed and assigns individual responsibilities. Identify and resolve issues and conflicts within the Project Team. **Plaintiff has taken the lead in two very important projects (Sequel conversion to mainframe and interface between Eagle and Allscripts systems) while working as an analyst for the Eagle system, Plaintiff has the hands on experience to be a project manager on any project involving Eagle. She has the technical knowledge from her many years working on developing the system as well as the experience of maintaining the system. Over the years at Downstate, she has clearly demonstrated here organizational and documentation strengths. She has mentored others so they can do their job more proficiently as well as being a contributing team**

**worker when necessary.  Whenever team members have issues, Plaintiff is available to help them resolve the issue, by guiding or advise them where to find the appropriate resources.**

78. The written qualifications for the Project Manager position were: Bachelor's degree in Information Systems, Project Management or related technical field. 7+ years of experience with working knowledge of Hospital and Ambulatory Care Billing and Collections operations. 7+ years of experience in managing Hospital Revenue Cycle systems. 5+ years of experience data gathering/performing system analysis and developing/writing system requirements. 5+ years of experience working all aspects of the System Development Life Cycle. 5+ years of experience in a patient care/clinical environment. Professional (PMP) or other project management certification required. Experience working with test plans and test cases. Experience with Eagle 2000 system and Med-Matrix. MS Project, Visio, Excel and Word. Strong leadership skills with an ability to motivate direct reports. Detail oriented. Excellent communication skills both written and verbal and internal personal skills. Excellent analytical and problem solving skills. Ability to manage multiple projects concurrently.

79. Plaintiff met these educational and experience requirements and as listed above worked on all the programs including Eagle and paid close attention to detail and was excellent with her analytical and problem solving skills and was recognized for her leadership by being the lead on several major projects up to that time.

80. Based on Plaintiff's knowledge of Mr. Clenman's experience, he does not meet the requirements of having programming experience, strong technical training in Eagle, nor does he follow documentation procedures.  Plaintiff had worked with him on multiple projects where he has made changes without any documentation and the aftermath was difficult to

correct. Although Mr. Clenman had some prior supervisory experience his role was to supervise procedural maintenance functions and nothing related to actual programming. When it came to an actual programming project, Mr. Clenman was never involved in the project and it was difficult to get his input. Plaintiff recalls a time when Mr. Clenman failed to cooperate with Plaintiff and Ms. Lambkin on a documentation process which needed his input.  He failed to provide this input which caused problems for the project.

81. Given the job description and qualifications for the Project Manager Position, plaintiff was more qualified than Mr. Clenman.

82.  When plaintiff was interviewed for the Project Manager Position on November 17, 2016, Mr. Nath knew Plaintiff was telecommuting.  He never said that he thought the Project Manager Position could not be performed while she was telecommuting.

83. On December 23, 2016 Plaintiff was informed that Mr. Clenman had received the position for which plaintiff had interviewed.

84.  Based on the above facts Plaintiff claims SUNY-DMC failed to promote her because of her gender.

85. Alternatively, based on the above facts SUNY-DMC failed to promote Plaintiff in retaliation for filing the instant lawsuit and her request of the accommodation of telecommuting.

86. The decision not to promote Plaintiff was taken within two months of the filing of the instant lawsuit.

**Clenman is Made Plaintiff's Supervisor**

87. Shortly after Mr. Clenman was promoted, he was assigned to replace Ms. Lambkin as Plaintiff's supervisor.

88. On or about March 3, 2017, Plaintiff learned that her time was being audited for the entire

period that she has been working with the accommodation of telecommuting.

89. Upon information and belief no other members of Plaintiff's cohort were subjected to such an audit.

90. On or about December 23, 2016, again within two and a half months of filing the instant lawsuit, plaintiff requested and received a copy of the organizational chart for her department. Her name appeared under the title "Report Writer."

91. Plaintiff was a senior programmer analyst.

92. When previously a former Programmer Analyst, was mislabeled as "Report Writer," Defendant Clenman was adamant that her title was incorrect and must be changed due to the low and humiliating nature of the title Report Writer.

93. When plaintiff brought this issue to management's attention they stated that it was an error, conceding that report writer is, as it sounds, a lesser position than senior program analyst. Nonetheless for several months Plaintiff's name was publicly listed in a demoted position.

**Clenman Papers Plaintiff's File and Lowers Plaintiff's Performance Review**

94. On or about January 10, 2017, roughly three months after Plaintiff filed suit Defendant Clenman began writing disciplinary reprimands to Plaintiff wherein he misrepresented Plaintiff's work practices while cc'ing senior management on this correspondence including Nath and Sookhoo.

95. Also on or about January 10, Plaintiff was informed that she was being given a new performance evaluation by Susann Lambkin. Ms. Lambkin had given Plaintiff an outstanding review for 2016; however due to pressure from Nath, Clenman and other members of lower management Plaintiff received a new performance review with a substantially lower rating. That is, Defendants would not allow Plaintiff to be reviewed as exemplary because she is in

litigation with SUNY-DMC.

96. On or about January 25, Plaintiff received notice from Clenman that he was receiving negative reports from the Business office about Plaintiff, stating by email "I am getting numerous complaints from the Business Office that items are not handled in a timely manner."

97. When Plaintiff contacted the Business Office to learn the nature of the complaints the Business Office stated that no such complaints were made.

98. However two staff members at the Business Center repeated nearly verbatim statements made by Clenman that they preferred if Plaintiff performed her work on site at her desk. This complaint echoed that of Clenman who himself had almost never stopped by Plaintiff's desk when she worked onsite.

99. By these comments Plaintiff learned that various members of SUNY-DMC staff and management viewed her accommodation for her disability as an opportunity to subject Plaintiff to unwarranted scrutiny and discipline.

100.    On or about January 25, 2017 Clenman also misrepresented to Plaintiff the work assignment document she was required to fill out stating that a particular work assignment document which subjected Plaintiff's work to greater scrutiny and documentation standards than others in her group, was the one that Plaintiff's counsel and counsel for SUNY had agreed to. Rather, upon information and belief, Clenman had added an additional column to the document in question and yet sought to pass the document off as one that Plaintiff's attorneys had consented to.

101.    Previously, Clenman, in reference to Plaintiff's last review from Susann Lambkin which was positive, stated that such review was positive only "by the grace of god."

102.    By this statement Defendant Clenman demonstrated his animus, whether retaliatory or

discriminatory towards Plaintiff, and his desire to give her a negative review independent of the merit of her work.

103.    Defendant's negative revision of Plaintiff's 2016 assessment and the false and pretextual complaints about Plaintiff's work would not have happened in the absence of a retaliatory motive.

104.    Defendant's retaliatory negative review and false reports about Plaintiff were materially harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

105.    Also, upon Clenman's promotion, he began to transfer many of the responsibilities associated with his former position to Plaintiff, thus increasing her workload.

106.    On or about January 10, 2017 Clenman told Plaintiff "I need to find people to take over my work now that I am a manager."

107.    Upon information and belief, Defendant Clenman did not make this statement to any other employee in his charge.

108.    However instead of finding "people" to perform the tasks of Clenman's previous position, Clenman disproportionately assigned this workload to Plaintiff.

109.    Upon information and belief, Plaintiff has been assigned a substantially larger workload than her colleagues by her manager Clenman due to his animus against her as a disabled person, or in retaliation for Plaintiff filing the instant lawsuit or for receiving reasonable accommodation by telecommuting.

110.    Despite repeated requests by Plaintiff to receive work assignment alongside the other members of her team, Clenman has refused to do so.

111.    On information and belief no other members of the Revenue Cycle Application Group are

required to produce productivity spreadsheets as is Plaintiff.

112.    On information and belief, Defendant Clenman has increased Plaintiff's workload in retaliation for Plaintiff's reasonable accommodation of telecommuting, and/or because she filed the instant lawsuit.

113.    On information and belief, Defendant SUNY-DMC's and Clenman's assignment of a materially increased and disproportionate workload to Plaintiff would not have happened in the absence of a retaliatory motive.

114.    Defendants' retaliatory workload imposed on Plaintiff is materially harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.

115.    On or about February 13, 2017 Plaintiff received a revised evaluation from Susann Lambkin for 2016 that was less positive than her original review.

116.    Ms. Lambkin stated, "Management has requested that the review be modified."

117.    On information and belief, which is based on what she was told by Ms. Lambkin,  the negative comments contained therein that were previously not included were made at the behest of Nath and Clenman due to their retaliatory animus against Plaintiff for filing the instant lawsuit and/or for her accommodation, or because of their discriminatory animus against Plaintiff as a disabled person.

118.    Clenman subsequently admitted to Plaintiff that he was unaware of what Plaintiff's work consisted of, even though he had previously asked Ms. Lambkin to downgrade Plaintiff's performance review.

119.    No other employees supervised by Ms. Lambkin in 2016 had their performance assessments lowered.

120.    On or about February 15, 2017 Plaintiff sent an email to Clenman regarding instances of

harassment, monitoring and various misrepresentations regarding Plaintiff's work. Prior to the

email, Defendant Clenman had falsely accused Plaintiff of being a "rogue employee."

121.    Defendants' negative revision of Plaintiff's 2016 performance assessment would not have

happened in the absence of a retaliatory motive.

122.    Defendants' retaliatory negative review of Plaintiff's work is materially harmful to the

point that it could well dissuade a reasonable worker from making or supporting a charge of

discrimination.

## SUNY-DMC'S CONTINUOUS AND ONGOING PAY DISCRIMINATION AGAINST PLAINTIFF AND OTHER WOMEN IN HER DEPARTMENT

123.    Plaintiff has been subject to unlawful disparate pay by SUNY-DMC because of her gender

since her hire in May 2008 to the present.

124.    This discrepancy cannot be accounted for by a seniority system; (b) a merit system; or (c)

or any factor other than sex or any *bonafide* factor other than sex.

125.    When plaintiff made these allegations in the EEOC Complaint, Defendant's response

included documents which were supposed to rebut the allegation of disparate pay.   The

Defendant provided the EEOC with various lists of persons which SUNY-DMC determined

were in comparable positions to Plaintiff.   These positions included all the positions in the

Revenue Cycle Applications Group and all those in the IT department the same title as plaintiff

of Senior Programmer Analyst 4, or SL4.

126.    Rather than refuting Plaintiff's disparate pay claim, the charts bolstered this claim.

127.    Plaintiff was employed by SUNY in its IT Department as a computer programmer in a

team of programmers in the Revenue Cycle Applications Group responsible to support a

mainframe system called Eagle.

128.    Since the start of Plaintiff's employment by SUNY-DMC, all the male members of the IT Department in the category of programmer Analyst SL4 have had higher salaries than any female member of the group. That is: the salaries of the SL4s male employees range from $111,822 to $85,000; whereas the salaries of the SL4s female employees range from $107, 600 to $82,464.

129.    On average, the women Programmer Analysts SL4's have higher education than the male members of the group. Yet all female members of the group have salaries below the average group salary and below the average male employee salary.

130.    Based on the Charts provided by Defendant SUNY-DMC to the EEOC a disparity in pay exists between women and men in the SL4 Category even after factoring in tenure.

131.    Based on the Charts provided by Defendant SUNY-DMC to the EEOC the disparity in pay between women and men in the SL4 Category does not exist by reason of the contract governing pay of SUNY-DMC employees.

132.    The Charts provided by Defendant SUNY-DMC to the EEOC support Plaintiff's claim that she is paid less than men in the group because of her gender.

133.    Every paycheck Plaintiff receives is part of a continuing violation of her right to be paid free from pay discrimination.

134.    Plaintiff is the only employee who is proficient in all aspects of the Revenue Cycle Application Group's responsibilities and she was requested at various points to take on responsibilities of male colleagues who earned salaries approximately fifty percent (50 %) higher than hers.

135.    Even after taking on these responsibilities, Plaintiff continued to receive a discriminatorily low salary because of her gender.

136.    Plaintiff is similarly situated to those male coworkers whose work she performed in every
way but her pay bracket, which was artificially depressed because of her gender.

137.    Yet Plaintiff's pay bracket is not an impediment to receiving the raise previously promised
by former CIO Dooley, since her salary has not reached the top of her pay bracket.

138.    For example, another woman in the department with greater tenure in her title as compared
with male colleagues in the same pay bracket was paid only 88% of what her male colleague
was paid.

139.    The discrepancy in Plaintiff's case is even greater. That is: among workers in the rank of
SL4, with the title Senior Program Analyst, Plaintiff's direct comparator is a male employee
who started at SUNY-DMC six months before Plaintiff and was promoted to the title of SL4
ten months after Plaintiff's hiring as an SL4. The salary reports provided by Defendant SUNY-
DMC to the EEOC show that in 2015 the male comparator earned $99,783 while Plaintiff
earned $88,363. Nor can this disparity be accounted for by education as Plaintiff and
comparator have the same educational level.

140.    This male Comparator Plaintiff has discovered is Igor Soshnik who is part of the Systems
Operations Group.

141.    The Systems Operations Group performs many of the same computer functions as the
Revenue Cycle Operations Group.  That is they work on the same mainframe computer as
plaintiff.

142.    While the Operations Group is more back office in supporting the mainframe to run
properly, the Revenue Cycle Applications Group has to work on the mainframe to ensure the
fiscal security of SUNY-DMC through ensuring all billing is done properly as well, and all of
the payments by third parties are made to the Hospital and bills owed are paid.   Both the

Systems Operations Group and the Revenue Cycle Group require programming skills which are substantially similar to each other.

143.    Both the Operations Group where Mr. Soshnik is located and the Revenue Cycle Applications Group provide operations services to other parts of the hospital.

144.    Therefore the jobs of both plaintiff and her comparator are substantially similar.

145.    Also not only was Mr. Soshnik making $11,000 more than Plaintiff in the 2015 charts which were submitted to the EEOC by Defendant SUNY-DMC he also received a promotion in 2016 and is now earning considerably more than plaintiff.

146.    Viewed in light of the totality of circumstances the actions alleged to have occurred since plaintiff first attempted to address what she believed to be discriminatory decisions regarding pay and promotion, Plaintiff has suffered an ever increasing level of actions against her as stated above, including being denied promotion, as well as having her supervisor Clenman lower her performance review and try to make her out to be a bad employee by papering her file and ongoing communications of complaints to upper management.  The ever increasing actions led to plaintiff moving from internal complaint to EEOC charges and finally litigation.

147.    Plaintiff has suffered and continues to suffer emotional distress as a result of Defendant SUNY DMC's deliberate discriminatory and retaliatory actions.

148.    Plaintiff's chronic illness diagnosed during the course of the retaliation in or about May 2016 has been exacerbated by the severe stress caused by Defendants' actions.

149.    Plaintiff continues to fear ongoing retaliation and discrimination and has been humiliated and frustrated by the unlawful barriers to her professional advancement placed in her way by Defendants.

**COUNT I: GENDER BASED PAY DISCRIMINATION IN VIOLATION OF 42 USC §2000e *et. seq.,* AGAINST DEFENDANT SUNY-DMC**

1.   Plaintiffs repeat and re-allege 1 – 149 as though fully set forth herein.

2.   Based on those allegations, Defendant SUNY discriminated against Plaintiff on the basis of gender by paying Plaintiff a lesser rate of pay than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments or establishment within the same county.

3.   The pay discrepancy between men and women cannot be accounted for by a seniority system; (b) a merit system; or (c)  any factor other than sex or any bonafide factor other than sex.

4.   This practice is continuous and ongoing and every lower paycheck continues the statute of limitations.

5.   Plaintiff has been subjected to disparate pay and has been denied promotions—most recently in December 2016 to the position of Project Manager.

6.   As a direct and proximate result of Defendant SUNY-DMC's unlawful and discriminatory conduct in violation of Title VII Plaintiff suffered and continues to suffer emotional distress and continues to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

**COUNT II: RETALIATION IN VIOLATION OF 42 USC §2000e *et seq.,* AGAINST DEFENDANT SUNY-DMC**

7.   Plaintiff repeats and re-alleges paragraphs 1 –149 as though fully set forth herein.

8.   Based on those allegations, Defendant SUNY-DMC retaliated against plaintiff for engaging in protected activity beginning in 2015 and ongoing through her filings of EEOC Charges in October 2016 and the filing of this litigation in October 2016.

9.   Further, as described, *supra,* Defendant SUNY-DMC engaged in a campaign of retaliation against Plaintiff after she filed the instant lawsuit by, failing to promote her, by lowering

her performance evaluation and by allowing her supervisor to continue to engage in false complaints about her performance to upper management.

10.   Many of these retaliatory actions described in the immediately preceding paragraphs occurred within two months of Plaintiff initiating the instant lawsuit and all of them occurred with approximately six months of initiating the instant lawsuit.

11.   Such actions, individually, and taken together would dissuade a reasonable worker from making or supporting a charge of discrimination.

12.   By the actions described above, among others, Defendant SUNY-DMC retaliated against Plaintiff in violation of 42 USC §2000e *et seq.*

13.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation 42 USC §2000e *et seq.* Plaintiff suffered and continues to suffer emotional distress and continues to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, and emotional distress, for which she is entitled to an award of damages.

**COUNT III: DISCRIMINATION IN VIOLATION OF *THE REHABILITATION ACT*, AGAINST DEFENDANT SUNY-DMC**

14.   Plaintiff repeats and re-alleges paragraphs 1 –149 as though fully set forth herein.

15.   The State of New York is a recipient of federal funds and thus SUNY-DMC is subject to the Rehabilitation Act, 29 U.S.C. § 794.

16.   The Rehabilitation Act prohibits, *inter alia*, retaliation for engaging in activity protected by the Act.

17.   Plaintiff engaged in activity protected by the Act by requesting reasonable accommodation in spring of 2016 and subsequently protesting infringement of her rights to reasonable accommodation.

18. Defendant SUNY-DMC retaliated against Plaintiff as a disabled person by, *inter alia*, unlawfully failing to promote her, by lowering her performance evaluation and by subjecting allowing her supervisor Clenman to continue to undermine her by sending false complaints about her performance to her and upper management. As a direct and proximate result of Defendant SUNY-DMC's unlawful and retaliatory conduct in violation of 29 U.S.C. § 794 Plaintiff continues to suffer emotional distress and continues to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

## PRAYER FOR RELIEF

Wherefore, plaintiff requests the following relief:

a) Back pay, including all fringe benefits;

b) Compensatory damages for emotional distress and suffering;

c) Attorney's fees and costs;

d) Such relief as is authorized by federal, state, and city law; and

e) Awarding plaintiff such other relief as the court deems just and proper.

## <u>JURY TRIAL</u>

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to a jury trial.

Dated: New York, New York
November 12, 2018

Respectfully submitted,
MIRER MAZZOCCHI &JULIEN PLLC

_____

By: Jeanne Mirer
*Attorney for Plaintiff*
150 Broadway, 12th floor
New York, NY 10038
(212) 231-2235

jmirer@mmsjlaw.com